### In re COHEN.

District Court, S. D. New York.

July 26, 1937.

Benj. I. Shiverts, of New York City, for bankrupt.

Krieger & Guzik, of New York City (Leo Guzik, of New York City, of counsel), for objecting creditor.

LEIBELL, District Judge.

The objecting creditor moves for the confirmation of the referee's report, which sustains four of the specifications of objections filed by said creditor to the discharge of the bankrupt. The referee's report is dated February 19, 1937, but prior to the motion to confirm the report the bankrupt obtained an order to show cause for a further hearing, explaining in his moving affidavit that he could adduce additional proof to negative the referee's findings on specifications II, III, IV, and VII. Upon the return of the order to show cause the objecting creditor submitted an answering affidavit and the court then made the following order: "Re-Referred to Referee as Referee for examination, testimony and report—in the event that the Referee desires further testimony." The referee, however, has determined that the bankrupt had full and ample opportunity to present his defense; that the taking of further proof would in no way alter the referee's decision; and that therefore there was no valid reason for receiving further proof. The referee accordingly resubmitted to the court his original report, reaffirming each and every finding therein made and again recommending that the bankrupt's application for a discharge be denied.

Without considering the additional testimony that the bankrupt desired to offer when he requested that he be granted a further hearing and basing my decision of this motion on the testimony and exhibits received at the hearings before the referee, I am of the opinion that the motion to confirm the referee's report should be denied and the bankrupt should be granted a discharge.

Specification II reads as follows:

"II. Upon information and belief that the bankrupt has committed one of the offenses punishable by imprisonment under the Bankruptcy Act in that he knowingly and falsely swore in his petition in bankruptcy that he was in business at 350 Fifth Avenue, New York City, whereas in fact he was at the time of the filing and verification of said petition employed by the National Safety Bank & Trust Company at a salary of $2,400 a year."

The referee found that at the time of the filing of the petition in bankruptcy, May 3, 1935, the bankrupt was employed at the National Safety Bank & Trust Company, 1384 Broadway, where he had been employed four or five months, and that from the time he became thus employed by the National Safety Bank & Trust Company he was not active as an insurance agent.

According to the testimony of John L. Kassoff, who was the head of the insurance agency and the bankrupt's immediate boss, he was not sure as late as April 25, 1935, whether the bankrupt was going to remain with them and he gave the bankrupt an opportunity to decide if he wanted to remain in the insurance business. Mr. Kassoff testified: "No, sir, I was not sure at any time because his license was in force for a full year and there was no occasion to discontinue his license and I think he did write some business even after that. I was trying to determine if he would come back to us full time or devote his activity to some other work."

In his petition in bankruptcy, the bankrupt gave as his business address 350 Fifth avenue, which is the office of the Mutual Life Insurance Company. He did not give the National Safety Bank & Trust Company, 1384 Broadway, as his business address. The bankrupt claims that his employment by the bank immediately prior to the bankruptcy was only temporary. While he was not active as an insurance agent, it appears from the testimony of Mr. Kassoff, that the bankrupt had not fully severed his connection with the insurance company. Apparently his contract of employment as an insurance agent was still in force, because he wrote some policies after May 3, 1935. Under the circumstances I cannot agree with the finding of the referee that the statement by the bankrupt that his place of business was 350 Fifth avenue was a false statement "knowingly and fraudulently made."

Specification III charges:

"III. That the bankrupt committed one of the offenses punishable by imprisonment under the Bankruptcy Act in that after having been duly sworn by Referee Peter B. Olney, Jr., on May 17th, 1935, he knowingly, fraudulently and wilfully made the following false oaths and gave the following false testimony:

" 'Q. What were your average earnings in the last three months? A. As far as insurance is concerned, absolutely nothing.

" 'Q. What else do you do? A. I have a temporary job as a solicitor for a bank.'

"Upon information and belief that said testimony was false in that said bankrupt did earn moneys as insurance solicitor within three months preceding the date of said testimony and that the position which he had as a solicitor for the National Safety Bank & Trust Company was not temporary but was a permanent job."

The referee has found that the above-quoted testimony of the bankrupt was false in two respects: First (quoting from the referee's report). "Between February 3, 1935 and May 3, 1935 (three months) I find that bankrupt received as commissions from the Insurance Company at least the sum of $61.63." That sum was the bankrupt's commission on the premium paid on policy 4,922,769 issued to M. Weil on December 31, 1934. The bankrupt's attorney argues that this commission was not earned within the three months prior to the bankruptcy, since the policy was written on December 31, 1934. The commission was paid on February 28, 1935.

The distinction between earned commissions and commissions received was recognized by the attorney for the objecting creditor when he examined this bankrupt on April 2, 1936, and asked these questions:

"Q. What commissions did you receive from the Mutual Life in 1935? A. First year premiums—$535.07; renewals: $124.-03.

"Q. How much of these sums did you earn prior to April 26th, 1935? A. I can't tell you that offhand.

"Q. Part of these commissions were earned prior to April 26th, 1935? A. That is right."

The bankrupt at the hearing on the specification, while being examined by the attorney for the objecting creditor, testified:

"Q. Did you earn any money as a result of insurance premiums for the three months prior to May 17, 1935? A. I believe I did.

"Q. How much did you earn? A. I cannot tell you that. I went over that with you once before."

And further

"Q. In other words, from January until May, 1935, you made no money as a life insurance salesman, as far as writing policies is concerned, is that right? A. To the best of my recollection that is right. I might be mistaken, there might have been one policy but that is the best of my knowledge."

It is apparent that there is some distinction between earning commissions and receiving commissions, especially since they are not payable by the company to the agent until the insured person pays the premium. The insurance agent may have done all the work in writing the policy so that he has earned the commissions, but his receipt of the commissions is dependent upon the payment of the premium by the insured within a specified time.

There is no proof that the bankrupt wrote any policies during the three months' period prior to the filing of the petition in bankruptcy; in fact, it appears that the last policy he wrote, prior to the filing of the petition in bankruptcy, was some time in the early part of January, 1935.

The amount involved in this specification is small, $61.63. It had been paid about nine weeks prior to the bankruptcy. Apparently the sum had been spent and was not available for creditors. There is no claim that it was an asset that should have been part of his estate in bankruptcy. I cannot see, therefore, how his testimony in respect to this item could be considered as so material as to form the basis for the denying to the bankrupt a discharge, even assuming that the commission was not earned by the bankrupt until he actually received it on February 28, 1935, although he wrote the policy on December 31, 1934. Nor do I find anything in the record on which to base the conclusion that his testimony was deliberately false.

In respect to the bankrupt's testimony that his position with the National Safety Bank & Trust Company was temporary, the referee reports: "The proof of employment for four or five months I find to be prima facie proof that the employment was not temporary, casting the burden of proof on bankrupt to prove that the employment was temporary. Bankruptcy Act, § 14b [as amended, 11 U.S.C.A. § 32 (b)]. No attempt was made by bankrupt to establish that fact." I cannot agree with the referee that an employment of four or five months at a bank as a solicitor of new accounts is prima facie proof that the employment was not temporary or that in this case no attempt was made by the bankrupt to establish the fact that the employment was temporary. At the hearing

the bankrupt testified, in respect to that specification, that he started his employment at the National Safety Bank & Trust Company in December, 1934; that he had no written contract with them; that he did not spend all of this time at the bank; that he was around 350 Fifth avenue (Mutual Life Insurance Company's office) quite a good deal; that he called at 350 Fifth avenue about three or four times a week; that he was hired by Charles Richter, the vice president of the bank, as a solicitor to get new business for the bank and was paid a salary of $200 a month. At the time of his examination before the referee on this specification the bankrupt was still employed by the bank.

In his examination by the attorney for the objecting creditor on April 2, 1936, the bankrupt stated that he was still connected with the Mutual Life Insurance Company; that his employment with the National Safety Bank & Trust Company in December, 1934, was "on approval with the bank until June 1935"; that he received $200 a month until July 1, 1935; and that after July 1st he received a salary of $3,000 a year. The testimony of the bankrupt, taken on April 2, 1936, pursuant to an order obtained by the objecting creditor March 31, 1936, was offered as the objecting creditor's Exhibit 3 at the hearings subsequently held by the referee on the issues raised by the specifications.

In view of the testimony as above quoted, I cannot agree with the referee that "no attempt was made by the bankrupt to establish that fact," i. e., that his employment by the bank was temporary. The bankrupt was asked the name of the officer of the bank who had hired him. He gave the name. The attorney for the objecting creditor very probably would have had that officer under subpoena to testify as a witness at the hearing, if his testimony would have contradicted the bankrupt. In his petition for an order to show cause, verified March 12, 1937, the bankrupt states: "Petitioner is able to produce officials of the bank who will testify that the employment at the bank was temporary in its nature and that its duration was uncertain and depended upon future events." This testimony the referee refused to receive when the matter was re-referred to him by Judge Coxe; the referee reports "that the taking of further proof would in no way alter my decision."

On the record before the referee I am of the opinion that the bankrupt refuted that part of the specification and the referee should not have found that the bankrupt had deliberately testified falsely in respect to the nature of his employment at the bank. Further, I fail to see how it can make any difference to creditors whether his employment at the bank was temporary or permanent. The amount of his salary was disclosed by the bankrupt and that was more important. The fact that the bankrupt received an increase in salary beginning July 1, 1935, is some indication that the status of his employment by the bank changed at that time, as he testified.

Specification VII reads as follows:

"VII. Upon information and belief that the bankrupt committed one of the offenses punishable by imprisonment in that he knowingly and fraudulently omitted from his schedules in bankruptcy liabilities due or claimed to be due to the following persons: Morris Plan Bank of New York, Mrs. John A. Kassoff, Cairo Mills and Irving I. Schnur, and that he also failed to specify in his schedules in bankruptcy that said Mrs. John A. Kassoff had received and held an assignment of commissions due to the bankrupt from the Mutual Life Insurance Company of New York."

The referee found that the bankrupt knowingly and fraudulently omitted from his schedules in bankruptcy the creditor Irving I. Schnur, who is the sole objecting creditor to the bankrupt's discharge. The referee finds that "the record indicates plenty of motive for omitting Schnur and his excuse for so doing is unavailing in view of the fact that he was notified prior to filing the petition by objecting creditor's attorney that objecting creditor claimed that bankrupt was indebted to him upon the cause of action upon which thereafter the judgment was obtained." The referee goes on to state: "From the whole record I find that bankrupt omitted Schnur deliberately and for the purpose of trying to forestall any recovery objecting creditor might get by suit by going through bankruptcy without objecting creditor's knowledge."

This does not seem to be a sound argument. If the bankrupt did not list Schnur as a creditor and Schnur had no knowledge of the bankruptcy proceeding, how would a discharge in bankruptcy avail the bankrupt in any subsequent suit by Schnur on his claim? The bankrupt admits that he did not schedule Schnur and that he had received a letter from Schnur's attorney the month prior to the filing of the petition in

bankruptcy; but the bankrupt contends that he did not owe anything to Schnur and that that is the reason he did not list Schnur as a creditor. When we consider the nature of Schnur's claim, we can understand why the bankrupt may have concluded that he did not owe Schnur anything. This claim admittedly was at least five and a half years old at the time of the bankruptcy. It was for a small amount, some $900, compared with the total of the bankrupt's liabilities, about $96,000. Schnur sued on his claim after the petition in bankruptcy was filed and he obtained a judgment after a trial in October, 1935. The bankrupt thereupon moved to amend his schedules to include the amount of the judgment, listing Schnur as a creditor. Schnur has not filed any claim in the bankruptcy proceeding, according to the statement of his attorney made to the court on the argument of this motion. The bankrupt testified that he did not list Schnur until October, 1935, "because I did not owe him the money. I still maintain I do not owe him the money and the fact you got a judgment does not show I owe him any money." Schnur's claim was based upon a stock transaction, allegedly a joint venture of himself and the bankrupt in 1930, which according to Schnur resulted in a loss of about $1,800. He sued the bankrupt for one-half of the sum with interest and recovered a judgment of $1,337.44.

I think the bankrupt's explanation for not having listed Schnur as a creditor is a reasonable one, and I am of the opinion that the record does not sustain the conclusion of the referee that the bankrupt "knowingly and fraudulently" omitted from his schedules in bankruptcy the claim of Irving I. Schnur.

The fourth specification sustained by the referee reads as follows:

"IV. Upon information and belief that the bankrupt committed one of the offenses punishable by imprisonment under the Bankruptcy Act in that he knowingly and fraudulently concealed from the creditors herein and omitted from his schedules in bankruptcy in this proceeding that at the time of the filing of said petition there was due him moneys from the Mutual Life Insurance Company as commissions as an insurance solicitor."

In respect to this specification the referee finds: "Though bankrupt testified that at the time he filed his petition in bankruptcy there was no money due him from the insurance company, that he owed the company money, objecting creditor adduced proof that on May 3, 1935 $872.49 was due to bankrupt on renewal premiums, that is assuming that renewal premiums on policies which bankrupt had written were paid in the future when due." The referee further finds that: "These renewal commissions on policies written prior to bankruptcy and which would be payable to bankrupt if and when the premiums due after bankruptcy were paid, were assets to which a trustee in bankruptcy would have been entitled (re Wright [C.C.A.] 157 F. 544, 18 L.R.A.(N.S.) 193)." The referee also finds: "It follows that bankrupt by omitting in his schedules all mention of these renewal commissions concealed assets from his creditors. There is no proof that he was ignorant of the law in this respect and I find that concealment was done knowingly and fraudulently and that Specification IV has been sustained."

Though ignorance of the law does not excuse any one, nevertheless before a finding can be made that a concealment was done "knowingly and fraudulently" there should be some facts on which to base an intent to conceal. Bankrupt testified in relation to a certain assignment that he had made of commissions to Emma Kassoff that:

"A. I did not think that was property.
* * *
"A. It was not commissions, I did not earn any commissions, I only earned renewals.
"Q. You assigned the right to receive money? A. Well, I did not think that was property, your Honor, that is my error."

The above quotation indicates that the bankrupt was "ignorant" of the law in this respect. That would not at all be surprising. It may very well be that a layman would not consider the right to receive commissions on renewal premiums an asset that would pass to his trustee in bankruptcy or that should be listed in the bankrupt's schedules. As the referee indicates, this was not money absolutely due the bankrupt. It was only contingently due depending upon whether an insured continued the policy in force and paid the future premiums.

I am of the opinion that a discharge should not be denied to a bankrupt where he has made a mistake as to the law on a question that itself was the subject of considerable litigation. In the case of In re

304

Wright (C.C.A.) 157 F. 544, 546, 18 L.R. A.(N.S.) 193, a referee in bankruptcy certified the question to the District Court (151 F. 361). Then the matter was appealed to the Circuit Court of Appeals. The decision will be hereinafter referred to.

Further, the referee's own conclusion in this case shows that this sum of $872.49 was not *due* to the bankrupt on the date of bankruptcy, May 3, 1935. There is nothing to show that any part of that sum was actually payable to the bankrupt at the time of the bankruptcy. The bankrupt's rights to the commissions on some of these renewal premiums would depend ·upon the payment of those renewal premiums on dates as much as seven or eight years after the date of the bankruptcy. Who can forecast the future so as to state what the right to receive those contingent sums may have been actually worth on the date of the bankruptcy, May 3, 1935? The specification charges that the bankrupt omitted from his schedules in this proceeding "that at the time of the filing of said petition there was due him moneys from the Mutual Life Insurance Company as commissions as an insurance solicitor."

■ The bankrupt is charged in this specification with having concealed from his creditors commissions due him. There is no proof in the record what commissions were actually due the bankrupt from the insurance company on May 3, 1935. If they were worth anything and if they were clearly an asset of the estate in bankruptcy, the trustee presumably would have brought a proceeding to compel the bankrupt to transfer his property right in these commissions to the trustee. No such proceeding was instituted. This is an element to be considered in a doubtful case. Remington, § 3421.

The bankrupt's rights to commissions were fixed by this contract with the company. That contract, dated December 9, 1933, was received in evidence before the referee. In respect to the agent's right to commissions on renewal premiums paragraph 3 of the contract provided:

"3. In addition to the compensation hereinbefore fixed, the Company will pay you the following Scale of Renewals upon payment to the Company of the premiums indicated, provided this contract, and/or the contract which it supersedes, have/has been continuously in force for three years; otherwise, provided at the time such renew-

als become due, you are under contract as a representative of this Company. In event of your death, any renewal interest will not be forfeited."

Paragraph 6 of the contract provided:

"6. This contract may be terminated by either party upon thirty days' notice and upon payment in full of any indebtedness due either party."

The agent's right to a commission on a renewal premium accruing during the first three years of the contract depended upon the agent being employed as such when the renewal premium became due; and his right to renewal premiums falling due after the three-year period depended upon the agent having been continuously under contract of employment for three years. Under the terms of the contract and as of May 3d, 1935, the date the petition in bankruptcy was filed, there were no commissions on renewal premiums due the bankrupt and there is no proof of any commission on first year's premiums being due the bankrupt from the insurance company on that date.

■ The referee in his conclusion in respect to this specification, after assuming that the value of the property right of the bankrupt (under his contract) to receive commissions on the contingent renewal premiums was on May 3, 1935, the full amount of those prospective commissions, states that there was cast upon the bankrupt the "burden to show that he owed the insurance company more than $872.49." There was no such burden placed upon the bankrupt. He testified that there was no money owing to him from the insurance company at the time ·the petition in bankruptcy was filed; that in fact he owed the insurance company money; that from time to time he borrowed money from the insurance company against premiums that might be paid on policies that he had written; and that if he earned commissions these commissions were applied in payment of the loans. The office was able to loan him up to $50 in cash. Mr. Kassoff testified that there were a number of loans of this type.

■ A question the referee asked Mr. Webber, an employee of the Mutual Life Insurance Company, clearly shows that no such amount as $872.49 was due the bankrupt on May 3, 1935:

"By the Referee:

"Q. That means on policies previously written, he would be entitled to that amount

if the next premiums were paid? A. If all the renewal premiums under which commissions were due under his contract were paid.

"Q. For how long would that run? A. There are varying terms according to the type of policy. On an ordinary life policy, there would be five renewals at seven and one-half per cent and one renewal at five per cent; on term policies there would be five per cent for nine years.

"Q. That is if all the premiums were paid in the future? A. That is correct. * * *

"Q. That would be contingent on the people living as long as he would get commissions? A. The insured must be alive and pay the premiums before any commissions are earned."

The referee was in error in determining that these commissions on renewal premiums were due the bankrupt as of the date of bankruptcy, May 3, 1935, and had a value of $872.49 on that day. The distinction between the marketability of the bankrupt's contingent interest in those commissions on renewal premiums and the transferability of the interest was pointed out by the Circuit Court of Appeals in its opinion in the Wright Case, supra, from which the following is quoted:

"It is urged in the second place that the collection of renewal premiums requires continued service on the part of the bankrupt, and that his creditors are not entitled to his future services. This contention may be agreed to without affecting the question whether the renewal interests are assignable. It is true that, in case they are transferred, the bankrupt cannot be compelled to render any future services. Collection by means of the cashier alone might or might not prove effective. Some arrangement for procuring the bankrupt's services might be desirable. If no arrangement could be made, the insurance company might refuse its consent to the transfer. So it is possible that the bankrupt might cause the forfeiture of the renewal interests by leaving the employment of the company. These contingencies might render the interest to be transferred to the trustee of little value; but they would not render such interest unassignable. Therefore, without examining further the objections to the transfer, we may say that all of them relate to the marketability of the interests in question, rather than the transferability, and have no direct bearing upon the question certified. We accordingly answer that question in the affirmative."

Mr. Kassoff, the bankrupt's boss at the insurance agency, stated that:—

"Q. Were there any other transactions between your office and Mr. Cohen in which there were loans made by the office itself? A. To Mr. Cohen?

"Q. Yes. A. As I remember correctly, a number of times, and this is all on the records, we advanced money to Mr. Cohen which he had to pay back from commissions at a later date."

The bankrupt entered the employ of the insurance company in December, 1933. Assuming that, as Mr. Webber testified, most of the policies were life insurance policies, commissions would be payable on renewal premiums on the oldest policy at least until December, 1939, assuming also that under the terms of his contract the agent was entitled to receive them. Most of the policies were written in 1934, and on term policies the commissions on renewal premiums would not become due until the renewal premiums were paid, some of them not until 1943.

There is a further matter to be considered in connection with this specification IV and the referee's conclusion in respect thereto. Another specification, V, charged that the bankrupt had assigned his right to these prospective commissions within twelve months prior to the filing of the petition to Mrs. John A. Kassoff, and that the assignment was fraudulent and without consideration, and that the proceeds of said assignment were retained or returned to the bankrupt. In respect to this specification the referee found that the purpose of the assignment was to secure John A. Kassoff, husband of Emma Kassoff, by reason of his indorsement for bankrupt of a Morris Plan note. The referee found that the assignment was not made "with intent to hinder and defraud bankrupt's creditors." This assignment was still in effect at the time of the filing of the petition in bankruptcy. Apparently the release under this assignment by the assignee in favor of the bankrupt was not made until January 14, 1936.

For the reasons hereinabove set forth, I am unable to agree with the conclusion of the referee sustaining specification IV.

In my opinion specifications II, III, IV, and VII were not sustained and the referee's report is accordingly not confirmed. The bankrupt is granted a discharge.