### In the Matter of Philip A. DIORIO, Bankrupt.
### No. 65 B 869.

United States District Court
S. D. New York.
Feb. 19, 1968.

Schwartz & Duberstein, Brooklyn, N. Y., for bankrupt; Conrad B. Duberstein, Brooklyn, N. Y., of counsel.

Frank & Frank, New York City, for objecting creditor; Irving Frank, New York City, of counsel.

MANSFIELD, District Judge.

On November 3, 1965, Philip A. Diorio filed a voluntary petition in bankruptcy, accompanied by schedules sworn to by him which represented that he had liabilities of approximately $750,000, of which approximately one-third were for taxes and other non-dischargeable debts, and no assets other than a home in which he had no equity. Kreisler-Borg Construction Co., a creditor, petitions for review of a decision of Referee in Bankruptcy, Asa S. Herzog, dismissing its six specifications of objection to the bankrupt's discharge under § 14c of the Bankruptcy Act, 11 U.S.C.A. § 32(c), which were as follows: (1) failure to keep books; (2) and (3) transfer within 12 months with intent to hinder, delay or defraud creditors; (4) withholding of records; (5) false oath in relation to schedules; and (6) false testimony at the first meeting of creditors.

The bankrupt had been president and part owner of Elite Concrete Construction Corp. (hereinafter "Elite Corp."), a company engaged in the reinforced concrete construction business which assigned for the benefit of creditors in March 1963. Its successor, "D" Concrete Construction Corp. (hereinafter " 'D' Corp."), acquired most of its equipment from Elite Corp., for which it paid the latter's payroll expenses. Although no stock of "D" Corp. was formally issued, the bankrupt had "a mutual agreement" with his younger brother, Thomas Diorio, under which each owned 50;% of the equity of the corporation. The bankrupt was president, Thomas was treasurer, and Catherine Gerber (Contino) was secretary. Sometime in 1964, "D" Corp. ceased to do business and became "defunct," although it was never formally dissolved or liquidated. About June or July 1963, Diorio Construction Corp. (hereinafter "Diorio Corp.") was organized with Thomas Diorio as president, Louis Schein as secretary, and the bankrupt as "general manager." Diorio Corp. apparently acquired its equipment from "D" Corp. Diorio Corp. became "defunct" about December, 1965.

At issue in all six specifications of objection is the question of whether the bankrupt was merely an employee of Diorio Corp., as he claims, or whether he had a financial interest therein, with his younger brother Thomas Diorio and Louis Schein acting as "nominees" with re-

spect to his interest.[1] This issue of whether the bankrupt was an officer or stockholder of Diorio Corp. is closely tied in with the bankrupt's failure to reveal in his sworn bankruptcy schedules his presidency and 50% ownership interest of "D" Corp., the immediate predecessor of Diorio Corp., and his falsely stating under oath in an affidavit filed with the Court on January 18, 1966, that he had no interest in "D" Corp. or Diorio Corp. If these false statements were knowingly and fraudulently made, the bankrupt's discharge must be denied. Furthermore, a determination that the bankrupt had fraudulently concealed his position and interest in "D" Corp. would be sufficient, when coupled with other evidence before the Court, to create reasonable grounds for believing that the bankrupt also fraudulently concealed a similar position and interest in Diorio Corp. In the case of both corporations ("D" Corp. and Diorio Corp.) the representations made to the Court by the bankrupt and his younger brother Thomas were substantially the same, and in addition to this parallel relationship, the bankrupt, although also claiming not to have been an officer or stockholder of Diorio Corp., had received or cashed Diorio Corp. checks drawn in substantial amounts. The chronology of events leading to discovery of the bankrupt's interest in "D" Corp., which had been concealed by him, is as follows:

Following the filing of his petition in bankruptcy and sworn schedules on November 3, 1965, the bankrupt appeared at the first meeting of creditors on November 22, 1965, at which time he reaffirmed under oath the statements made in his petition and schedules. He further testified that he resided at 128 Central Park South, New York City, the address given in his petition,[2] and that he was employed by Columbus Corp. in Puerto Rico. In his testimony he did not reveal any interest in Diorio Corp. or in its predecessor, "D" Corp.

On December 16, 1965, at the adjourned first meeting of creditors, the bankrupt did not appear. However, his wife, from whom he had separated, appeared and testified that he had an ownership interest in both Diorio Corp. and its predecessor, "D" Corp., contrary to his sworn schedules and testimony.

At the adjourned first meeting of creditors held on January 18, 1966, the bankrupt, who was working in Puerto Rico, again failed to appear. In view of his wife's testimony as to ownership interest in Diorio Corp. and "D" Corp., however, he executed an affidavit in Puerto Rico on January 10, 1966, presented by his attorney at the meeting, as follows:

"PHILIP DIORIO, being duly sworn, deposes and says:

1. I am the bankrupt herein.

2. That at the request of WILLIAM STEPHEN BROWN, the Trustee in the above matter, I hereby state under oath that I have no interest nor have I ever had an interest, nor have I been promised an interest in any corporation known as 'D' Construction Corp. or Diorio Construction Corp.

3. That I was at one time employed by the aforementioned corporations prior to any present employment.

4. That the principal officer, stockholder and director of both corporations is my brother THOMAS DIORIO and I am neither, a director, officer or stockholder of the said corporations.

---

1. A similar issue exists with respect to Columbus Construction Corp. (hereinafter "Columbus Corp."), organized in Puerto Rico in October 1965, but in view of the disposition of the issues with respect to "D" Corp. and Diorio Corp., it is not necessary to consider the question of the bankrupt's relationship to this corporation.

2. It now appears that he had separated from his wife and it is contended by the objecting creditor that he had taken up living with Mrs. Catherine Gerber (Contino), the bookkeeper and office manager of Diorio Corp., at 75 Shoreview Drive, Yonkers, with whom he had moved in October, 1965, to Puerto Rico.

5. That all my assets are set forth in the schedules annexed to my petition in bankruptcy.

6. That I further state that all moneys which were deposited by me in a special account opened by me in the bank in Puerto Rico were moneys of COLUMBUS CONSTRUCTION CORP. and were deposited for the purpose of defraying such expenses as might be incurred on behalf of COLUMBUS CONSTRUCTION CORP. in connection with the establishment of its business in Puerto Rico and that none of the funds so deposited were intended for my own personal use and that all of the monies expended by me were so expended solely on behalf of COLUMBUS CONSTRUCTION CORP."

On May 18, 1966, Thomas Diorio, the bankrupt's brother, testified at a § 21a hearing that the bankrupt had no interest in "D" Corp. or Diorio Corp.; that he (Thomas) was the president of "D" Corp.; and that the bankrupt was neither an officer nor a director of "D" Corp. Continued investigation of the bankrupt's affairs resulted in the discovery of bank records of Bankers Trust Company establishing that the bankrupt was president of "D" Corp. After this discovery, the bankrupt admitted at the adjourned first meeting of December 19, 1966, thirteen months after filing his petition and schedules, that he was an officer of "D" Corp. and that he was half-owner of "D" Corp. with Thomas.[3] He testified, however, that he was not an officer or stockholder of Diorio Corp., but was merely "general manager."

### I. "D" Corp.

The bankrupt failed to testify or produce any other evidence to explain his false oath with respect to his position as president and half owner of "D" Corp. Section 14c of the Bankruptcy Act, 11 U.S.C.A. § 32c(1) provides:

"The court shall grant the discharge unless satisfied that the bankrupt has (1) committed an offense punishable by imprisonment as provided under Title 18, United States Code, Section 152;"

which provides, in part,

"Whoever knowingly and fraudulently makes a false oath or account in or in relation to any bankruptcy proceeding * * * shall be fined not more than $5,000 or imprisoned not more than five years, or both."

It is undisputed that the bankrupt did make a false oath in the schedules of assets filed with his voluntary petition in bankruptcy on November 3, 1965, in which he failed to reveal his financial interest in "D" Corp., and in his affidavit of January 10, 1966, in which he specifically denied being an officer or stockholder of "D" Corp. The Referee found, however, that these false statements were made inadvertently, not "knowingly and fraudulently", i. e., with knowledge of their falsity and wilfully with intent to defraud. See Tancer v. Wales, 156 F.2d 627 (2d Cir. 1946).

■■ In arriving at the conclusion that the bankrupt's false statements were inadvertently made, the Referee took into account five factors. First, the bankrupt disclosed his half-interest in "D" Corp. at the adjourned first meeting of creditors on December 19, 1966. However, a false statement in schedules is not "cured" by the bankrupt's subsequent disclosure, In re Tabibian, 289 F.2d 793 (2d Cir. 1961), and in this case the bankrupt's disclosure of his interest came more than a year after the schedules were filed on November 3, 1965, during which time investigation had unearthed

---

3. In view of the bankrupt's belated admission, apparently prompted by the creditors' discovery of the tell-tale fact that he was both president and a 50% owner of "D" Corp., it is apparent that he had either induced his younger brother Thomas to conceal these facts or that Thomas, supposedly also the president of Diorio Corp., was either confused or kept in the dark by the bankrupt as the person in charge of both corporations.

proof of the bankrupt's interest. Second, the Referee found that the bankrupt was subject to "mighty stress" due to a feud with his wife, who appeared at hearings seeking "vengeance" and caused the bankrupt to be taken into custody after the hearing on discharge in connection with matrimonial litigation. A referee may, of course, credit the testimony of a bankrupt that the omissions complained of were due to inadvertence caused by such factors as temporary army duty, harassment by lawsuit, and distress of his wife. Avallone v. Gross, 309 F.2d 60 (2d Cir. 1962). However, there is no such testimony by the bankrupt in this case either that the false statements were inadvertent or that he was in fact under great stress due to matrimonial problems at the time they were made.

The other three factors considered by the Referee were that "D" Corp. ceased doing business in 1964, that shares of stock had never been issued, and that the bankrupt's interest was valueless when he filed his petition in bankruptcy on November 3, 1965. That stock in "D" Corp. was never formally issued to the bankrupt is of little probative force on the question of inadvertence, in view of the bankrupt's admission that he did own 50% of the equity in that company. The findings that "D" Corp. had ceased to do business and that its stock was worthless were based on the bankrupt's testimony and on a letter from his counsel to the trustee in bankruptcy.

However, it is unnecessary to resolve the difficult question of whether the Referee was "clearly erroneous", General Order 47, 11 U.S.C.A. Foll. § 53, in finding that the bankrupt's omission of his 50% interest in "D" Corp. from his schedules, standing alone, was inadvertent. For the bankrupt's half-interest in "D" was also omitted from the bankrupt's affidavit of January 10, 1966. The various factors considered by the Referee in determining that the omission from the schedules was inadvertent do not apply to the affidavit. The bankrupt made the affidavit while in Puerto Rico, far from his wife, from whose actions the Referee inferred that the bankrupt had been under matrimonial stress when he filed the schedules two months earlier. The affidavit was made in response to an inquiry from the bankrupt's trustee specifically directed to the bankrupt's interest in "D" Corp. (prompted by the wife's testimony that the bankrupt was an officer and stockholder of "D" Corp. and Diorio Corp.), thus rendering immaterial the circumstance that "D" Corp. had become "defunct" and its stock worthless because the very purpose of furnishing the affidavit was "to give dependable information without need of going further". United States v. Stone, 282 F.2d 547, 553 (2d Cir. 1960). The bankrupt's sworn statement with respect to whether he was an officer or stockholder of "D" Corp. would be relevant to the questions of whether he was an officer or stockholder of Diorio Corp. from which he had received substantial checks and whether he was concealing any of its records. Furthermore, the affidavit's unqualified denial, "I have no interest nor have I ever had an interest, nor have I been promised an interest" in "D" Corp., precludes any argument based on the bankrupt's testimony that his interest in "D" Corp. was not represented by stock formally issued but rather by "a mutual agreement" with his brother.

In these circumstances, the Court concludes that there were reasonable grounds to believe that the bankrupt knowingly and fraudulently made the false affidavit and that, therefore, the burden of proof on the issue of whether the false affidavit was knowingly and fraudulently made was on the bankrupt. See In re Melnick, 360 F.2d 918 (2d Cir. 1966). In view of the failure of the bankrupt to testify or present any other evidence to explain the false affidavit, it was clearly erroneous to find that the making of the false affidavit was inadvertent.

The fraudulent nature of the affidavit of January 10, 1966, is also evidence that

the omission from the schedules filed two months earlier on November 3, 1965 was likewise knowing and fraudulent. Therefore, in view of the lack of any testimony or other evidence presented by the bankrupt to explain the false omission in the schedules, the Court concludes that it was clearly erroneous to find that the false omission in the schedules was inadvertent.

## II. *Diorio Corp.*

The bankrupt's false oath with respect to his position and interest in "D" Corp., standing alone, would be sufficient to bar his discharge. In addition, at the hearing on objections to discharge held on May 8, 1967, the objecting creditor introduced evidence to show that the bankrupt also had an interest in Diorio Corp. The stubs of certain checks drawn on Diorio Corp. payable to Louis Schein or Thomas Diorio contained the pencil notation "gave to Phil", i. e., the bankrupt. Other Diorio Corp. checks were payable either to the bankrupt, or to cash and endorsed by the bankrupt, or to "D" Corp., of which the bankrupt was president and half owner. Furthermore, although checks written on an account of Diorio Corp. at Bankers Trust Company required the signatures of both Thomas Diorio, president, and Louis Schein, secretary, numerous such checks bore only the signature "Thomas Diorio" and were accordingly stamped "irregularity noted". A bank representative testified that the single signature "Thomas Diorio" on many of these checks did not "compare favorably" with the signature on the signature card. It was the theory of the objecting creditor that Thomas Diorio and Louis Schein were mere dummies cloaking the bankrupt's substantial ownership and control of Diorio Corp., that the bankrupt received the proceeds of various checks drawn on Diorio Corp., and that the bankrupt exercised control over Diorio Corp. through Catherine Gerber (Contino), his alleged mistress, who was the "bookkeeper and office manager" of Diorio Corp.

In view of this evidence that substantial funds of Diorio Corp. were transferred to the bankrupt or to "D" Corp., of which the bankrupt was half owner, and that a serious question existed as to the authenticity of the signature "Thomas Diorio" on many checks of Diorio Corp., and in view of the fraudulent statement of the bankrupt regarding his position as an officer and stockholder of "D" Corp., the Court concludes that there were reasonable grounds to believe that the bankrupt had a financial interest in Diorio Corp. and that the burden, therefore, was on the bankrupt to prove that he had no such interest. 11 U.S.C.A. § 14c.

To sustain this burden, the bankrupt relied solely on his own testimony to the effect that when Diorio Corp. was formed, he was employed there by his younger brother Thomas as an engineer and "general manager"; that he had not received the proceeds of the various checks, the stubs of which bore the notation "gave to Phil", but "surmised" that he was handed the checks to deliver to Schein or Thomas; and that he "may have" cashed certain checks, for example, for his brother to use for company Christmas gifts. This vague testimony with regard to the disposition of various checks and funds received by the bankrupt must be viewed with considerable caution. Not only was it unlikely that the bankrupt, a trained civil engineer with considerable business experience, would go from his positions as president and part owner of Elite Corp. and president and half owner of "D" Corp. to work at Diorio Corp. as a mere employee for his younger brother, who had no such training; but the bankrupt's characterization of his position by the title "general manager" becomes even less persuasive on the question of whether he was in a position to direct the affairs of Diorio Corp. when viewed in the light of his fraudulent denial that he was an officer or stockholder of "D" Corp.

In view of the weakness of the bankrupt's testimony, the Court concludes that this testimony alone was not

sufficient to sustain the bankrupt's burden of proof on the question of whether he had a financial interest in Diorio Corp., and that it was up to the bankrupt to produce supporting proof, such as the testimony of Catherine Gerber (Contino), his alleged mistress, who was the bookkeeper and office manager of Diorio Corp., to show that he had no such interest and that he did not receive the proceeds of the checks.

Accordingly, the discharge of the bankrupt must be denied. The petition to review is granted, and the order of the Referee is reversed.

So ordered.