In re Gabriel A. ARCURI, Jr., Debtor.

James MacLEOD, Plaintiff,

v.

Gabriel A. ARCURI, Jr., Defendant.

Bankruptcy No. 88–30531.

Adv. No. 88–7047.

United States Bankruptcy Court,
S.D. New York.

June 30, 1990.

Victor M. Meyers, Rapport, Meyers, Griffen & Whitbeck, Hudson, N.Y., for plaintiff.

Lewis D. Wrobel, Wrobel & Genova, Poughkeepsie, N.Y., for debtor-defendant.

## DECISION ON OBJECTION TO DISCHARGE PURSUANT TO 11 U.S.C. § 727(a)(4)(A) and (B)

JEREMIAH E. BERK, Bankruptcy Judge.

This is an objection to discharge pursuant to Section 727(a)(4)(A) and (B) of the Bankruptcy Code ("Code"), 11 U.S.C. § 727(a)(4)(A) and (B), by James MacLeod ("Plaintiff") against the Debtor, Gabriel A. Arcuri, Jr. ("Debtor"). Plaintiff is a disputed unsecured creditor holding a claim in the amount of $15,000,000 arising out of personal injuries sustained in an automobile accident.

Plaintiff alleges that the Debtor gave false information on the schedules appended to his bankruptcy petition either intentionally or with such reckless indifference to the truth as to constitute fraud. Plaintiff claims that the Debtor falsely listed a secured obligation owing to Geygln Corporation ("Geygln"), a family owned enterprise, on the Schedule of Creditors Holding Security ("Schedule A–2") filed with his Chapter 7 petition on September 19, 1988. Plaintiff asserts that the Debtor owes no money to Geygln, and that even if he did, the obligation is unsecured. Further, Plaintiff claims that the Debtor misrepresented the value of his 20 percent ownership of Geygln, listed as an asset on his Schedule of Personal Property ("Schedule B–2").

Prior to the commencement of trial, the Debtor moved to dismiss a portion of the complaint, but the motion was denied. Plaintiff then moved for summary judgment, but this motion was also denied. Trial was held on the first claim of the complaint. A summary of the pertinent facts adduced at trial on Plaintiff's objection to discharge follows.

## I. FINDINGS OF FACTS

The parties agreed to the following facts. Tr. at 11–13 (Nov. 15, 1989). The Debtor filed a voluntary petition for relief under Chapter 7 on September 19, 1988. At all times relevant to this proceeding, the Debtor owned 20 percent of the stock of Geygln, a non-publicly traded corporation owned solely by members of the Debtor's family. The Debtor's ownership of Geygln is represented by stock certificate number 7 which did not bear any notation that it was subject to a security interest. Plaintiff's Exhibit 4. The parties agreed that the Debtor was neither an officer nor a director of Geygln for the period in question.

In addition we make the following findings. The Debtor listed Geygln as a secured creditor holding an undisputed, non-contingent claim in the approximate amount of $50,000. Plaintiff's Exhibit 1. Under that portion of Schedule A–2 requiring disclosure of the security, the Debtor stated: "Loan against shares in family corporation", and indicated the approximate market value of the stock to be $45,000. In response to the requirement on Schedule B–2 to identify all stock interests, the Debtor reported: "Family Corporation—20% ownership, used as collateral on loan", but stated the market value at "0.00". By amendment filed September 15, 1989, the Debtor reduced his obligation to Geygln to $19,329 and again reported that the market value of the stock was "0.00". Plaintiff's Exhibit 3.

The Debtor, 34 years old at the time of trial, testified that he had completed four years of college, but did not obtain a degree. Tr. at 17 (Nov. 15, 1989). Although his college major was biology, in 1981 he became a securities salesperson after taking several qualifying exams. Id. at 18–19, 72. As a result of successfully completing these and other exams, he was permitted to sell both retail and wholesale stocks, bonds, mutual funds and life insurance. Id. at 19–22. Working successively at various investment firms, he eventually attempted to purchase an investment business in Albany during 1984. Id. at 21–23, 42–45. Ultimately, he terminated this business endeavor and went to work for the family corporation, Geygln. Id. at 23.

During the time the Debtor was employed by Geygln, he served in various capacities. *Id.* at 23, 29–32, 74–76. He received $19,600 from Geygln as annual salary in 1986 and 1987. *Id.* at 56–58. In addition, he received from Geygln in January, 1987 a "bonus" of $37,000, although he did not know why it was paid or who made the decision to issue it. *Id.* at 58–61, 85; Plaintiff's Exhibit 6.

The Debtor and his four siblings each owned 20 percent of the corporation's stock. Tr. at 25–26 (Nov. 15, 1989); Tr. at 69–70 (Dec. 20, 1989). It appears that either his father, Gabriel Arcuri, Sr., or his brothers, Graig and Gary Arcuri, were the chief officers of Geygln. Tr. at 28–29 (Nov. 15, 1989); Tr. at 64–65, 102–05 (December 20, 1989). Throughout his employment, the Debtor was neither an officer nor a director of Geygln. Tr. at 26, 73 (Nov. 15, 1989). At no time during the period in question was he involved in the decision-making processes nor did he have any authority to make loans or write checks for the corporation. *Id.* at 73, 84–85.

The Debtor began to borrow money from Geygln in late 1984 or early 1985 in order to pay for various legal fees incurred in defending against criminal charges resulting from an automobile accident and for expenses associated with the Albany investment firm he attempted to establish. *Id.* at 42, 44–49, 80–82. He also used Geygln loan proceeds to pay legal fees to defend against a disciplinary proceeding before the National Association of Securities Dealers. *Id.* at 82–84.

The Debtor could not recall the terms of the loans, but knew that Geygln had not charged any interest nor made any demand for repayment. *Id.* at 49–50, 55–56. He recalled that he had not signed any promissory notes or other documents memorializing the loans. *Id.* at 50, 55, 107–08. The loan proceeds were either paid to him or to third parties, although the Debtor did not know the amounts or dates of payment. *Id.* at 52, 55. At one point he testified that he was still borrowing from the corporation, but later stated that he was no longer borrowing from Geygln, but rather from his family members directly. *Id.* at 55, 107.

The Debtor testified that he believed his stock was retained by Geygln as collateral for his loans, although there was no agreement documenting this. *Id.* at 64–68. The stock certificate was maintained by Geygln with the corporate books and he never took possession of it. *Id.* at 26–27, 90–91. His brother Graig, an officer of Geygln during the time the loans were made, also testified that these loans were made "against the stock". Tr. at 70, 96–97 (Dec. 20, 1989). He too stated that there was no writing evidencing the pledge of stock as security for the loans, but noted that all of the outstanding stock was held by Geygln. *Id.* at 70, 98.

The Debtor was confused about how much he had borrowed from the family corporation. While aware that his creditors would rely on his bankruptcy schedules, he admitted that he read the Chapter 7 petition and supporting schedules "quickly" and was not sure of some responses. Tr. at 34–36 (Nov. 15, 1989). He explained that the petition was prepared in haste to prevent the continuation of an arbitration hearing on a securities disciplinary complaint. *Id.* at 76–78, 82–83. Although he subsequently reduced the amount shown on Schedule A–2 from $50,000 to $19,329, the Debtor nevertheless maintained at trial that he was unsure of the actual amount owed to Geygln and still believed that he owed Geygln $50,000. Tr. at 39–41 (Nov. 15, 1989); Plaintiff's Exhibit 1 and 3. He stated:

A. I don't know what the actual value of the loan is. I know in my mind what it should be. I can't tell you exactly what it is.

Q. Well, is it $50,000 or is it $19,000?

A. I don't know.

Q. So that isn't accurate either then, is it, the amended schedule?

A. I don't know.

Q. You don't know whether it is accurate?

A. I don't know whether it is accurate.

Q. Well, you claim that you owe Geygln some money, is that right?

A. That's correct.

Q. You don't know the amount that you owe them, though, is that correct?

A. The exact amount I don't know.

Tr. at 41 (Nov. 15, 1989).

The Debtor explained that he calculated the $50,000 debt "in his head" primarily based on what he was told by Geygln's bookkeeper, Kay Laraway, approximately one year before he filed the Chapter 7 petition. *Id.* at 78. He "had heard" that the corporation's accountant, Richard Koskey, had fixed the market value of his shares at $45,000. *Id.* at 89–90. Thereafter, he obtained the information used to amend Schedule A–2 to show the reduced obligation to Geygln and to value his stock at zero directly from the accountant. *Id.* at 86–87, 89.

Although his recollection was poor and frequently inconsistent regarding dates of loan transactions and related facts, *id.* at 32, 40–46, 49–55, other witnesses corroborated the essential facts of the Debtor's testimony.

For example, Richard Koskey, the accountant responsible for preparing Geygln's tax returns, testified that the corporation's 1985 tax return reflected year-end loans from the corporation to shareholders in the amount of $55,426. Tr. at 5–7, 23 (Dec. 20, 1989); Defendant's Exhibit A. In 1986, the corporation reported year-end shareholder loans of $55,226. Tr. at 22–23 (Dec. 20, 1989); Defendant's Exhibit B. Although Geygln's 1987 tax return did not show any shareholder loans at year-end, Koskey explained that the shareholder obligations could have been reported under the category of trade notes and accounts receivable elsewhere on the tax return. Tr. at 26–27, 32 (Dec. 20, 1989); Plaintiff's Exhibit 7.

To substantiate these loans, Kay Laraway, Geygln's bookkeeper, and Graig Arcuri, the officer responsible for approving most of the advances, testified. Through these witnesses, seven checks from Geygln to the Debtor or to third parties were received in evidence. Tr. at 37–41, 50–52, 54–63, 66–69; Defendant's Exhibits C through I. These checks, four of which bear the notation "loan", total $17,650. Graig Arcuri, who signed five of these checks, stated that Geygln advanced money to the Debtor on "numerous" occasions. Tr. at 65–66, 69 (Dec. 20, 1989). Denying that these advances were gifts, Graig Arcuri testified that they were in fact loans and that Geygln expected the money to be repaid. *Id.* He explained that the "bonus" was given to the Debtor in 1987, notwithstanding the Debtor's indebtedness to Geygln, in order to assist him financially as well as to avoid certain tax consequences to Geygln. *Id.* at 72–75, 84–85. Graig Arcuri also testified that no terms of repayment were specified and that Geygln never attempted to collect the loans. *Id.* at 94.

## II. DISCUSSION

### A. *In general*

Aptly described as a "cornerstone" of the debtor's economic rehabilitation, *In re Shapiro*, 59 B.R. 844, 847 (Bankr.E.D.N.Y. 1986), the discharge provisions of the Bankruptcy Code represent the "foremost remedy to effectuate the 'fresh start' which is the goal of bankruptcy relief to the debtor." *In re Graham*, 111 B.R. 801, 805 (Bankr.E.D.Ark.1990); *Dilworth v. Boothe (In re Dilworth)*, 69 F.2d 621, 624 (5th Cir.1934) (discharge of debts is "[o]ne of the great objects" of the bankruptcy law); *In re Berman*, 100 B.R. 640, 644 (Bankr.E. D.N.Y.1989) ("The granting to a debtor of a 'fresh start' is the quintessence of the bankruptcy code and the litmus against which any argument impacting discharge must be compared in determining compliance with congressional intent."); *In re Diodati*, 9 B.R. 804, 809 (Bankr.D.Mass. 1981) ("The fresh start offered by the 1978 Act may well be the most extensive since the seven year release described in the Old Testament...."). Through discharge, as the Supreme Court has observed, a debtor gains a " 'new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.' " *Lines v. Frederick*, 400

U.S. 18, 19, 91 S.Ct. 113, 113–14, 27 L.Ed.2d 124 (1970) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)).

Lying at the "heart" of the fresh start provisions of the Bankruptcy Code is Section 727. H.R.Rep. No. 595, 95th Cong., 1st Sess. 384 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787; *Matter of Brooks*, 58 B.R. 462, 464 (Bankr.W.D.Pa.1986) (Code § 727 is the "core of the fresh start provision in bankruptcy law"). As with each form of bankruptcy relief available under the Code, however, § 727 attempts to work a compromise between diametrically opposed interests. Whereas a discharge from debts is the debtor's "ultimate goal," B. Weintraub & A. Resnick, *Bankruptcy Law Manual* ¶ 3.01 at 3–2 (2d ed.1986), the law's predilection to afford financial relief is not "meant to protect the dishonest debtor." *Matter of Bonanza Import & Export, Inc.*, 43 B.R. 570, 575 (Bankr.S.D.Fla. 1984). A discharge under Code § 727 is a privilege, not a right. It may only be "granted [to] the honest debtor." *In re Tabibian*, 289 F.2d 793, 794 (2d Cir.1961); *In re McManus*, 112 B.R. 773, 775 (Bankr. E.D.Va.1990) (bankruptcy is a "privilege"); *In re MacDonald*, 50 B.R. 255, 259 (Bankr. D.Mass.1985) (a debtor has "no inherent right to a discharge"). This provision is designed to prevent a dishonest debtor from utilizing the law's protection to shield wrongdoing.

When presented with an objection to discharge, we must be "especially circumspect" in light of these important considerations. *In re Switzer*, 55 B.R. 991, 997 (Bankr.S.D.N.Y.1986). The court is required to construe the objection strictly against the objectant and liberally in the debtor's favor. *In re Tabibian*, 289 F.2d at 794; *In re Muscatell*, 113 B.R. 72, 73 (Bankr.M.D.Fla.1990); *In re Graham*, 111 B.R. at 805; *In re Bernard*, 99 B.R. 563, 569 (Bankr.S.D.N.Y.1989); *In re Montgomery*, 86 B.R. 948, 955 (Bankr.N.D.Ind.1988); *In re Latimer*, 82 B.R. 354, 359 (Bankr.E. D.Pa.1988); *In re Johnson*, 82 B.R. 801, 804 (Bankr.E.D.N.C.1988); *Matter of Brooks*, 58 B.R. at 464; *In re Switzer*, 55

B.R. at 997. The rationale for construing discharge objections liberally in the debtor's favor is that "[t]he filing of a bankruptcy petition would be of little aid to debtors in need of a 'fresh start' if creditors could easily attack the granting of a discharge." *In re Woerner*, 66 B.R. 964, 971 (Bankr.E.D.Pa.1986).

### 1. Burden of proof

Plaintiff bears the burden of proving the objection to discharge under Bankruptcy Rule 4005. This Rule, however, does not address the burden of going forward with the evidence and leaves to the court the responsibility to formulate rules governing the shift of this burden.

Although the burden of proof or persuasion must be borne by the plaintiff, once sufficient evidence is presented by the plaintiff to satisfy the burden of going forward with the evidence, the burden thereafter shifts to the debtor to provide additional evidence reflecting a satisfactory explanation to rebut the plaintiff's *prima facie* case. However, the plaintiff must bear the ultimate burden of persuasion by proving all of the essential elements necessary to bar a discharge by clear and convincing evidence.

*In re Bernard*, 99 B.R. at 570 (citations omitted); *In re Martin*, 88 B.R. 319, 321 (D.Colo.1988); *In re Montgomery*, 86 B.R. at 956; *Matter of Brooks*, 58 B.R. at 464; *Matter of Ramos*, 8 B.R. 490, 494 (Bankr. W.D.Wis.1981).

### 2. Standard of proof

Courts disagree as to the standard of proof applicable to objections to discharge under Code § 727(a)(4). Some apply a fair preponderance standard, *Farmers Co-operative Association v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982); *In re Mascolo*, 505 F.2d 274, 276 (1st Cir.1974); *In re Ward*, 82 B.R. 484, 486 (Bankr.E.D. Ark.1988); *In re Gonday*, 27 B.R. 428, 432 (Bankr.M.D.La.1983); *In re Irving*, 27 B.R. 943, 946 (Bankr.E.D.N.Y.1983). Others impose the more stringent clear and convincing standard, *North Community Bank v. Boumenot*, 106 B.R. 149, 150 (N.D.Ill. 1989); *In re Studley*, 35 F.Supp. 277, 279

(D.Me.1940); *In re Muscatell,* 113 B.R. at 74; *In re Portner,* 109 B.R. 977, 986 (Bankr.D.Colo.1989); *In re Ingersoll,* 106 B.R. 287, 292 (Bankr.M.D.Fla.1989); *In re Syrtveit,* 105 B.R. 596, 598 (Bankr.D.Mont. 1989); *In re Serritella,* 103 B.R. 313, 315 (Bankr.M.D.Fla.1989); *In re Latimer,* 82 B.R. at 359; *In re Greene,* 81 B.R. 829, 834 (Bankr.S.D.N.Y.1988), *aff'd,* 103 B.R. 83 (S.D.N.Y.1989); *In re Somerville,* 73 B.R. 826, 835 (Bankr.E.D.Pa.1987); *In re Woerner,* 66 B.R. at 972; *In re Shapiro,* 59 B.R. at 847. Under the former Bankruptcy Act, the Second Circuit applied the fair preponderance standard to an objection to discharge under § 14(c)(1), the predecessor to Code § 727(a)(4). *See, e.g., In re Robinson,* 506 F.2d 1184, 1187 (2d Cir.1974); *In re Slocum,* 22 F.2d 282, 285 (2d Cir.1927).

The legislative history to Code § 727(a)(4), at first blush, appears to suggest that the fair preponderance standard should apply.

> The fourth ground for denial of discharge is the commission of a bankruptcy crime, though the standard of proof is preponderance of the evidence rather than proof beyond a reasonable doubt. These crimes include the making of a false oath or account, the use or presentation of a false claim, the giving or receiving of money for acting or forbearing to act, and the withholding from an officer of the estate entitled to possession of books and records relating to the debtor's financial affairs.

H.Rep. No. 595, 95th Cong., 1st Sess. 384 (1977); Sen.Rep. No. 989, 95th Cong., 2d Sess. 98–99 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5884–5885, 6340. However, the legislative history seems inconclusive. It "speaks not of setting a standard of proof, but instead, apprises us that a false oath case, although akin to perjury, need not be tested by the traditional criminal standard of proof beyond a reasonable doubt." *In re Portner,* 109 B.R. at 980.

We believe the appropriate standard of proof for a Code § 727(a)(4) objection to be clear and convincing evidence. A debtor is presumed "innocent, honest, and entitled to a discharge unless and until proven otherwise." *Id.* at 985. As one court noted:

> Provisions dealing with the discharge have been traditionally recognized to be remedial and, as such, have always been liberally construed in favor of the debtor and against persons challenging the debtor's right to discharge of the Bankruptcy Code. Thus, it is well established that the burden is on the objecting party to prove that a debtor should be denied a discharge by way of clear and convincing evidence.

*In re Ingersoll,* 106 B.R. at 292 (citations omitted).

Where fraud is alleged, the appropriate standard of proof should be clear and convincing.

## B. *Section 727(a)(4)(A)*

### 1. Purpose

Code § 727(a)(4)(A) provides that a discharge shall be granted unless "the debtor knowingly and fraudulently, in or in connection with the case made a false oath or account." The purpose of this provision has been variously stated. Courts generally view Code § 727(a)(4)(A) as designed to insure that the debtor provides "reliable," *In re Muscatell,* 113 B.R. at 74; *In re Ingersoll,* 106 B.R. at 293; *In re Johnson,* 82 B.R. at 805; *In re Ingle,* 70 B.R. 979, 983 (Bankr.E.D.N.C.1987); *In re MacDonald,* 50 B.R. at 259, "dependable," *In re Tabibian,* 289 F.2d at 797; *In re Martin,* 88 B.R. at 323; *In re Shapiro,* 59 B.R. at 849; *In re Shebel,* 54 B.R. 199, 202 (Bankr.D.Vt.1985); *In re Diodati,* 9 B.R. at 807; *In re Mazzola,* 4 B.R. 179, 181 (Bankr. D.Mass.1980), or otherwise verifiable information for any party having an interest in the proper administration of the debtor's bankruptcy estate, *In re Wines,* 114 B.R. 794 (Bankr.S.D.Fla.1990) ("adequate information"); *Matter of Brooks,* 58 B.R. at 467 ("all of the necessary information"). A debtor has an "affirmative duty" to identify all assets, liabilities and to answer all questions fully and with the utmost candor. *In re Graham,* 111 B.R. at 806.

Creditors and those charged with the administration of the bankruptcy estate are

entitled to a "truthful" statement of the debtor's financial condition. *In re Johnson*, 82 B.R. at 805; *In re Ingle*, 70 B.R. at 983; *In re Mazzola*, 4 B.R. at 182 ("The trustee and creditors are entitled to honest and accurate signposts on the trail showing what property has passed through the bankrupt's hands during a period prior to his bankruptcy."). Such complete disclosure is "essential" to the proper administration of the bankruptcy case, *In re Evans*, 106 B.R. 722, 723 (Bankr.M.D.Fla. 1989), and is a "prerequisite" to the debtor's ability to obtain a discharge. *In re Montgomery*, 86 B.R. at 956; *In re MacDonald*, 50 B.R. at 259 ("cooperation is impelled by § 727(a)(4)(A)'s sanction for dishonesty"). As one court noted, "In order to obtain the blessings of a general discharge the debtor must reveal and not conceal her financial condition, because complete disclosure is the touchstone for receiving a bankruptcy discharge." *In re Lubin*, 61 B.R. 511, 513 (Bankr.S.D.N.Y. 1986). Another court explained:

> On the one hand, bankruptcy is an essentially equitable remedy.... In that vein, the statutory right to a discharge should ordinarily be construed liberally in favor of the debtor.

> \* \* \* \* \* \*

> On the other hand, the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction.... Neither the trustee nor creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight. The bankruptcy judge must be deft and evenhanded in calibrating these scales.

*In re Tully*, 818 F.2d 106, 110 (1st Cir.1987) (citations omitted).

### 2. Elements

A plaintiff must establish the following elements under Code § 727(a)(4)(A): (1) the debtor made a statement under oath, (2) such statement was false, (3) the debtor knew the statement was false, (4) the debtor made the statement with fraudulent intent, and (5) the statement related materially to the bankruptcy case. *Williamson v. Fireman's Fund Insurance Co.*, 828 F.2d 249, 251 (4th Cir.1987); *In re Bernard*, 99 B.R. at 570; *In re Johnson*, 82 B.R. at 805; *In re Shebel*, 54 B.R. at 202. Whether the debtor made a false oath within the meaning of Code § 727(a)(4)(A) is a question of fact. *Williamson v. Fireman's Fund Insurance Co.*, 828 F.2d at 251; *In re Bernard*, 99 B.R. at 570. The plaintiff must prove each element. *In re Shebel*, 54 B.R. at 202; *In re Nazarian*, 18 B.R. 143, 146 (Bankr.D.Md.1982).

Plaintiff alleges that the Debtor made the following false oaths in connection with his bankruptcy schedules and statements: (1) the Debtor falsely stated that he is indebted to Geygln; (2) even if the loans exist, the Debtor falsely overstated the amount of the obligation, (3) the Debtor falsely understated the value of his interest in Geygln; and (4) the Debtor falsely represented that his stock was pledged as collateral.

On his original schedules and statement of affairs, as well as the amendment to Schedule A-2 filed September 15, 1989, the Debtor declared "under penalty of perjury" that he read the documents and that they were "true and correct" to the best of his "knowledge, information and belief." Plaintiff's Exhibits 1 and 3. Code § 727(a)(4)(A) "clearly extends" to documents such as these filed under penalty of perjury. H. Sommer, *Consumer Bankruptcy Law and Practice* § 14.2.2.3 (3d ed.1988); B. Weintraub & A. Resnick, *Bankruptcy Law Manual* ¶ 3.03[4][a] at 3–9–10 (2 ed.1986). Thus, Plaintiff has established the first element of proof under Code § 727(a)(4)(A).

Likewise, Plaintiff established the fifth element of proof. The purportedly false statements are material as they relate di-

rectly to the possible discovery of undisclosed assets that could be made available for distribution to creditors. Materiality is established if the false oath relates to the "debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *In re Johnson*, 82 B.R. at 805; *In re Chalik*, 748 F.2d 616, 618 (11th Cir.1984); *In re Mascolo*, 505 F.2d at 277; *In re Shapiro*, 59 B.R. at 849; *In re Kessler*, 51 B.R. 895, 899 (Bankr.D. Kan.1985); *Matter of Ramos*, 8 B.R. at 495; H. Sommer, *Consumer Bankruptcy Law and Practice* § 14.2.2.3 (3d ed.1988).

██ We agree with those courts that require the debtor to make full disclosure, even of seemingly worthless assets. *In re Chalik*, 748 F.2d at 618; *In re Muscatell*, 113 B.R. at 74; *In re McManus*, 112 B.R. at 775; *In re Mazzola*, 4 B.R. 179, 183 (Bankr.D.Mass.1980). *But see In re Bergman*, 6 F.Supp. 898, 901 (S.D.N.Y.1934); *In re Lineberry*, 55 B.R. 510, 513 (Bankr.W.D. Ky.1985); *In re Waddle*, 29 B.R. 100, 103 (Bankr.W.D.Ky.1983). Detriment or prejudice to creditors is not an element of materiality. *In re Robinson*, 506 F.2d at 1188; *In re Slocum*, 22 F.2d at 285; *Matter of Brooks*, 58 B.R. at 467; *In re Cline*, 48 B.R. 581, 584 (Bankr.E.D.Tenn.1985) ("materiality does not depend on whether the falsehood is detrimental to creditors"). If the false oath pertains to an asset of *de minimis* value, however, this may tend to vitiate the debtor's fraudulent intent. *See, e.g., In re Taub*, 98 F.2d 81, 82 (2d Cir. 1938); *In re Irving*, 27 B.R. at 946. "The determination of relevance and importance of the question is not for the debtor to make. It is the debtor's role simply to consider the question carefully and answer it completely and accurately." *In re Mazzola*, 4 B.R. at 182; *In re Chalik*, 748 F.2d at 618.

██ For the following reasons we find that Plaintiff has failed to sustain his burden of proving the elements necessary to support his objection to discharge under § 727(a)(4)(A).

### 3. The existence of the Geygln loans

Plaintiff alleges that the Debtor falsely stated on Schedule A–2 and his subsequent amendment thereto that he is indebted to Geygln. Plaintiff attempted to prove this allegation primarily through the testimony of the Debtor. Not only did the Debtor testify that he was indebted to Geygln, Tr. at 39–42, 44–49, 80–84 (Nov. 15, 1989), but an officer of and the bookkeeper for Geygln testified as to the existence of the Debtor's obligation, Tr. at 37–41, 50–52, 54–63, 66–69 (Dec. 20, 1989). The Debtor also submitted documentary proof purporting to substantiate the borrowings, including a series of checks. Defendant's Exhibits A through I.

Although the Debtor's testimony concerning the specific dates, terms of repayment, interest rate and other facts pertaining to the loans was vague, we find that Plaintiff failed to present clear and convincing proof to the contrary. It was incumbent upon Plaintiff to establish the falsity with evidence that was both "definite and certain." 4 L. King, *Collier on Bankruptcy* ¶ 727.04 at 727–61 (15th ed.1990). Clearly, to deny a discharge for making a false statement, the statement must first be proven to be false. *Feldenstein v. Radio Distributing Co. (In re Feldenstein)*, 323 F.2d 892, 893 (6th Cir.1963). Where, however, the plaintiff "offers only an argument, and no record, to support his allegation," the plaintiff fails to sustain his burden of proof. *In re Somerville*, 73 B.R. at 835.

We acknowledge the difficulty in establishing a "false oath" objection to discharge. A party should not be expected to "prove the negative", especially where evidence necessary to support the objection is far more likely to lie in the debtor's hands. Yet, where a debtor responds with credible evidence to substantiate his scheduled debts, their existence must be accepted. *In re Aubrey*, 111 B.R. 268, 274 (9th Cir. Bankr.1990).

### 4. Amount of the loans

Plaintiff alternatively argues that even if some borrowing from Geygln took place, the Debtor overstated the amount of the

indebtedness. In support of this argument, Plaintiff cites the subsequent amendment downward by the Debtor, from $50,000 to $19,329, nearly one year after the bankruptcy case was filed. Plaintiff's Exhibit 3. Plaintiff additionally relies on the fact that the Debtor was able to produce checks, purporting to document the loans, totaling only $17,650.

■ The Debtor's amendment of his Schedule A–2 reducing the amount of the Geygln obligation constitutes an admission that the amount originally listed was false. The general rule is that an amendment "does not expunge the falsity of an oath." *In re Cline*, 48 B.R. at 585; *In re Diorio*, 297 F.Supp. 842, 845 (S.D.N.Y.1968), *aff'd*, 407 F.2d 1330 (2d Cir.1969) (false statement in a schedule "is not 'cured' by the bankrupt's subsequent disclosure"); *In re Graham*, 111 B.R. at 806; *In re Evans*, 106 B.R. at 723; *In re Montgomery*, 86 B.R. at 957; *In re Johnson*, 82 B.R. at 805. As one court noted:

> Section 727(a)(4)(A) does not provide for a grace period within which one can undo a false statement, made under penalty of perjury, by later declaring the truth. Nor is there any authority for the proposition that the amendment of a false statement requires the Court to pretend that the statement originally made was true.

*In re Shebel*, 54 B.R. at 203.

■ On the other hand, subsequent disclosure may be "some evidence of innocent intent." *In re Tabibian*, 289 F.2d at 797; *Matter of Kilson*, 83 B.R. 198, 203 (Bankr. D.Conn.1988). The inference of innocent intent reflected by a subsequent amendment becomes "slight", however, where the debtor amends schedules or changes testimony after the trustee or creditors have uncovered what the debtor has sought to hide. *Matter of Kilson*, 83 B.R. at 203. In our case it took nearly one year after the original petition and schedules were filed for the Debtor to move to amend his Schedule A–2. Indeed, the amendment was made after the objection to discharge was filed.

In an attempt to explain the error, the Debtor recalled that the original Schedule A–2 was filed in haste to forestall the commencement of litigation concerning his securities license. Tr. at 34–35, 76–77 (Nov. 15, 1989). The original amount scheduled as owing to Geygln was based on what the Debtor calculated "in his head" from information supplied to him one year earlier. *Id.* at 78. He amended Schedule A–2 to reflect the lesser amount upon new information he obtained from Geygln's accountant. *Id.* at 86–87, 89. At trial the Debtor nevertheless maintained that he still believed the correct amount due Geygln was $50,000, the amount originally scheduled. *Id.* at 41.

■ We reject that part of the Debtor's explanation seeking to excuse the error due to haste in preparation of the initial schedules. The considerable delay between the original schedules of September 19, 1988 and their amendment on September 15, 1989 undermines this excuse. Where, as here, the original filing is done in haste, but the amended filings "were done at the debtor's leisure," such tardy amendment falls "well short of the requisite disclosure." *In re Tully*, 818 F.2d at 111; *In re Nazarian*, 18 B.R. at 147 (even if haste caused the original error, "no carelessness could excuse the Debtor's failure to amend his schedules promptly when he had the leisure to do so"); *In re Gonday*, 27 B.R. at 433. We further note that the "correction" did not occur until *after* the commencement of the instant proceeding.

> A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath.
>
> \* \* \* \* \* \*
>
> Sworn statements filed in any court must be regarded as serious business. In bankruptcy administration, the system will collapse if debtors are not forthcoming.... The law, fairly read does not countenance a petitioner's decision to play a recalcitrant game, one where the debtor hides, and the trustee is forced to go seek.

*In re Tully,* 818 F.2d at 111–12; *Matter of Kilson,* 83 B.R. at 203.

■ Nonetheless, a statement is not fraudulent simply because it is false. *In re Lovich,* 117 F.2d 612, 613–14 (2d Cir.1942) ("Not every false oath in relation to a bankruptcy proceeding is made a criminal offense—only those that are 'knowingly and fraudulently' given. It must be an intentional untruth with respect to a material matter.") *In re Slocum,* 22 F.2d at 285; *In re Carlson,* 18 F.2d 1003, 1003 (E.D.Idaho 1926) (a discharge will not be denied for a "mere misstatement of fact"; there "must be willful misstatement of fact under oath ... in short, actual fraud"); *In re Crenshaw,* 95 F. 632, 633 (S.D.Ala.1899). The debtor's fraudulent intent must be proven to be "actual and not constructive," *In re Montgomery,* 86 B.R. at 957; *In re Shebel,* 54 B.R. at 204; B. Weintraub & A. Resnick, *Bankruptcy Law Manual* S3–3 (Supp.1988).

As direct evidence of fraudulent intent is "rarely possible", *In re Sklarin,* 69 B.R. 949, 953 (Bankr.S.D.Fla.1987); *Williamson v. Fireman's Fund Insurance Co.,* 828 F.2d at 252 ("the problems inherent in ascertaining whether a debtor has acted with fraudulent intent are obvious."); *In re Kaiser,* 722 F.2d 1574, 1582 (2d Cir.1983) ("Fraudulent intent is rarely susceptible to direct proof."); *In re Montgomery,* 86 B.R. at 957; *In re Nazarian,* 18 B.R. at 146–47 ("a debtor is unlikely to testify directly that his intent was fraudulent"), fraudulent intent may be inferred, *In re Mascolo,* 505 F.2d at 276; *In re Ingersoll,* 106 B.R. at 292; *In re Sklarin,* 69 B.R. at 953; *In re Cline,* 48 B.R. at 584, or proven by circumstantial evidence, *In re Aubrey,* 111 B.R. at 274; *In re Johnson,* 82 B.R. at 805; *In re Ingle,* 70 B.R. at 983. For example, where there has been a "pattern" of falsity, *In re Syrtveit,* 105 B.R. at 598; *In re Johnson,* 82 B.R. at 805; *In re Ingle,* 70 B.R. at 983, or a "cumulative effect" of falsehoods, *In re Shapiro,* 59 B.R. at 849; *In re Gonday,* 27 B.R. at 433, a court may find that fraudulent intent has been established.

■ Likewise, a court may infer fraudulent intent under Code § 727(a)(4)(A) from a debtor's reckless indifference to or cavalier disregard of the truth. *In re Montgomery,* 86 B.R. at 957; *Sullivan v. Tracey (In re Tracey),* 76 B.R. 876, 880–81 (Bankr.D. Mass.1987); *In re Zahneis,* 75 B.R. 201, 203 (Bankr.S.D.Ohio 1987); *In re Ingle,* 70 B.R. at 983; *In re Shapiro,* 59 B.R. at 849; *In re Shebel,* 54 B.R. at 204; *In re MacDonald,* 50 B.R. at 260; *In re Savel,* 29 B.R. 854, 857–58 (Bankr.S.D.Fla.1983); *In re Gugliada,* 20 B.R. 524, 528 (Bankr.S.D. N.Y.1982); *In re Diodati,* 9 B.R. at 808–09; *In re Mazzola,* 4 B.R. at 182.

> The requirement imposed upon the debtor to not be deliberately dishonest is a reasonable quid pro quo for release from his financial hardship. Similarly, if a debtor is unprepared to provide honest answers and actions, preferring to adopt a cavalier and arrogant attitude toward truthfulness, this Court cannot in good conscience grant the discharge.

*Matter of Brooks,* 58 B.R. at 468.

■ At trial, the Debtor continued to believe that he owed Geygln $50,000 notwithstanding his amended Schedule A–2 showed only $19,329 owed and the Geygln checks offered to substantiate the loans totaled only $17,650. Upon these facts, as well as the Debtor's general demeanor and credibility, we find no pattern of falsity or reckless disregard for the truth. The Debtor appeared to be genuinely unsure of the exact amount borrowed from the family enterprise. An honest mistake or inadvertence do not evince a fraudulent intent within the meaning of Code § 727(a)(4)(A). *In re Muscatell,* 113 B.R. at 74; *In re Evans,* 106 B.R. at 724; *In re Ingersoll,* 106 B.R. at 293; *In re Ligon,* 55 B.R. 250, 253 (Bankr.M.D.Tenn.1985); *In re Shebel,* 54 B.R. at 202; *In re MacDonald,* 50 B.R. at 259; *In re Diodati,* 9 B.R. at 807; *In re Terkel,* 7 B.R. 801, 803 (Bankr.S.D.Fla. 1980); *In re Fischer,* 4 B.R. 517, 518 (Bankr.S.D.Fla.1980); *In re Mazzola,* 4 B.R. at 182. We, therefore, find that Plaintiff failed to sustain his burden as to the Debtor's misstatement of the amount due Geygln,

### 5. Value of Geygln stock

█ The Debtor initially valued his 20 percent stock interest in Geygln at $45,000 on Schedule A–2. He subsequently filed an amendment to this schedule restating the value of the stock as worthless. Based on the amendment, the Debtor clearly made a false statement as to the value of his stock. Plaintiff appears to assert that the amendment is a fraudulent undervaluation of the Debtor's interest in Geygln.

A false valuation of an asset is clearly within the purview of Code § 727(a)(4)(A). *See, e.g., Matter of Bobroff,* 69 B.R. 295 (E.D.Pa.1987); *In re Johnson,* 82 B.R. 801 (Bankr.E.D.N.C.1988); *In re Ligon,* 55 B.R. 250 (Bankr.M.D.Tenn.1985); *In re Seruntine,* 46 B.R. 286 (Bankr.C.D.Cal. 1984); *In re Valley,* 21 B.R. 674 (Bankr.D. Mass.1982). For instance, a debtor valued his stock interest as "unknown" on his schedules, yet on prior financial disclosure statements "never had any trouble valuing his stock" as $100,000 or. $163,500, *In re Ligon,* 55 B.R. at 253. The court found the debtor's "valuing of the stock as unknown [to be] a poorly conceived effort to disguise and conceal this substantial asset" and that "the inference of fraud is unavoidable." *Id.*

█ Where it reasonably appears that the oath is false, the burden falls upon the debtor to come forward with evidence to prove that it was not an intentional misrepresentation. "Otherwise, the court may infer fraudulent intent from the unexplained false statement." B. Weintraub & A. Resnick, *Bankruptcy Law Manual* ¶ 3.03[4][a] at 3–10 (2d ed.1986); *see, e.g., In re Mascolo,* 505 F.2d at 276; *Matter of Bobroff,* 69 B.R. at 297; *In re Ward,* 82 B.R. at 486. Absent a "credible explanation," *In re Cline,* 48 B.R. at 584, the court may infer fraudulent intent from an unexplained false statement. *In re Mascolo,* 505 F.2d at 276.

The Debtor explained how he originally valued his stock interest in Geygln at $45,000 by the following:

> When I misread the thing up here it says market value, I didn't realize it was market value. I thought it meant the asset value, something like that. The best of my knowledge was that in '85 I had heard that Richard Kosky [sic] [Geygln's accountant] had valued the shares to be 20—20 percent of the shares to be worth 45,000. I felt, number one, I knew it wasn't exactly that. I felt that that was high, and I figured if you had to err, err on the side of, you know, being optimistic. However, if, you know, the fact that its market value, stock that isn't liquid isn't worth too much.

Tr. at 90 (Nov. 15, 1989).

He admitted that for the three-year period between the time he first heard of the valuation and the time he filed his petition in Chapter 7, he did not make any inquiry as to the proper value of the stock. *Id.* at 93. He stated that Geygln's accountant subsequently provided the information upon which he reduced the valuation of the stock from $45,000 to zero on his amendment to Schedule A–2. *Id.* at 87–89; Plaintiff's Exhibit 3.

Plaintiff, however, presented "no concrete evidence as to the exact value" of the stock. *In re Wines,* 114 B.R. at 797, and failed to "carry his burden of demonstrating that the stock had any value." *In re Terkel,* 7 B.R. at 803; *In re Seruntine,* 46 B.R. at 287–88; *In re Gugliada,* 20 B.R. at 528. The record is devoid of any evidence demonstrating the Debtor's fraudulent intent within the meaning of Code § 727(a)(4)(A). *See, e.g., In re Schnoll,* 31 B.R. 909, 912 (Bankr.E.D.Wis.1983).

### 6. The Geygln stock as collateral

█ Plaintiff claims that the scheduling of the loans from Geygln as being secured by his stock is fraudulent within the meaning of Code § 727(a)(4)(A). To substantiate the fraud, Plaintiff relies on the fact that no security agreement or other writing exists between the Debtor and Geygln evidencing the pledge of Debtor's stock as collateral for the loans. Plaintiff also believes that the lack of any notation on the original stock certificate to show that it was subject to a lien further proves the fraud.

Both the Debtor and his brother Graig testified that it was their belief that the stock served as collateral for the loan. Graig Arcuri explained that Geygln required the stock as collateral because "no one else was getting money from the company in that manner, and to make it fair, we had to have something to back it up in case everything just broke loose for Gabe and he ended up with nothing, it just wouldn't be fair to the other family members." Tr. at 87 (Dec. 20, 1989).

 An attempt to obfuscate the value of estate assets by the ruse of a fictitious security interest or assignment falls within the type of conduct prohibited by Code § 727(a)(4)(A). *See In re Collins*, 45 F.Supp. 990 (E.D.N.Y.1942). If, however, a misrepresentation is made without "[s]cienter and fraudulent, willful intent" a Code § 727(a)(4)(A) objection is not established. *In re Irving*, 27 B.R. at 945.

Plaintiff argues that New York Uniform Commercial Code § 8–103 mandates that a stock certificate bear a notation that it is subject to a security interest. This section states:

A lien upon a security in favor of an issuer thereof is valid against a purchaser only if—

(a) the security is certificated and the right of the issuer to such lien is noted conspicuously thereon, or

(b) the security is uncertificated and a notation of the right of the issuer of such lien is contained in the initial transaction statement sent to such purchaser.

N.Y.U.C.C. § 8–103 (McKinney 1990).

The Debtor, in response, notes that this provision applies only to a situation where the transferee of the stock is a purchaser and is inapplicable where the Debtor, who was not a purchaser, merely pledged the stock back to the original issuer. In support of this contention, the Debtor relies upon New York Uniform Commercial Code § 8–321, which provides in pertinent part:

(1) A security interest in a security is enforceable and can attach only if it is transferred to the secured party or a person designated by him pursuant to a provision of subsection (1) of Section 8–313.

(2) A security interest which has thus been transferred pursuant to agreement by a transferor who has rights in the security to a transferee who has given value is a perfected security interest, but a security interest which has been transferred solely under subparagraph (1)(i) of Section 8–313 becomes unperfected after 21 days, unless, within such 21 days, the requirements for transfer under any other provision of subsection (1) of Section 8–313 are satisfied.

(3) A security interest in a security is subject to the provisions of Article 9 except that

(a) no filing is required to perfect the security interest; and

(b) no written security agreement signed by the debtor is necessary to make the security interest enforceable, except as otherwise provided in subparagraph (1)(h) or (1)(i) of Section 8–313.

N.Y.U.C.C. § 8–321 (McKinney 1990).

To deny a discharge, Code § 727(a)(4) requires that the debtor "swears to what he knows to be false." *Morris Plan Industrial Bank v. Henderson*, 131 F.2d 975, 977 (2d Cir.1942). As the clear and convincing standard is "demanding," *In re Latimer*, 82 B.R. at 359, "evidence [that] is in equilibrium" fails, *In re Muscatell*, 113 B.R. at 74. Although "ignorance of the law does not excuse anyone," there must first be proof that an asset was concealed knowingly and fraudulently. *In re Cohen*, 20 F.Supp. 298, 303 (S.D.N.Y.1937). Where a mistake occurs in an area of law that is the "subject of considerable litigation", or simply unclear as the preceding references to Article 8 of the New York Uniform Commercial Code indicate, the requisite knowledge and fraudulent intent are not demonstrated. *Id.* We accept the testimony of the Debtor and his brother that they intended to treat the Debtor's stock as collateral for his loans from Geygln.

886

### C. *Code § 727(a)(4)(B)*

 At the commencement of trial, Plaintiff indicated that he was also asserting an objection to discharge under Code § 727(a)(4)(B). Tr. at 15–16 (Nov. 15, 1989). This objection was not developed at trial nor specifically addressed in the parties' post trial memoranda. To the limited extent, however, that this issue was presented, we make the following findings.

Code § 727(a)(4)(B) provides that a discharge may be denied if the debtor "presented or used a false claim". The purpose of this provision is to prevent "fraud by presentation of inflated or fictitious claims or use of such claims." 4 L. King, *Collier on Bankruptcy* ¶ 727.05 at 727–66 (15th ed.1990). In practice, however, "[v]ery few cases have ever arisen under this provision." *Id.* at n. 2.

This discharge objection has been applied to a situation where the debtor filed a falsely inflated proof of claim on behalf of his father-in-law without the claimant's authorization. *In re Cline*, 48 B.R. 581 (Bankr.E.D.Tenn.1985). The court found that the debtor failed to provide any credible excuse and accordingly denied the debtor's discharge. The provision has also been applied to a situation where a debtor falsely listed a debt for alimony owed to a former spouse. *In re Pope*, 18 B.R. 125, 127 (Bankr.S.D.Fla.1982). The court in *Pope*, however, found that although the debt "at best represented a dubious liability," the debtor did not fraudulently or knowingly misstate this debt. *Id.*

In *In re Woerner*, 66 B.R. 964 (Bankr.E. D.Pa.1986), the plaintiff attempted to prove that money advanced to the debtor by his father to pay legal fees constituted a gift, rather than a loan. The plaintiff argued that the debtor's scheduling of this as a debt warranted the denial of the debtor's discharge under Code § 727(a)(4)(B). The court relied on the debtor's testimony in finding it "reasonable that, while the Father obviously wanted to do everything he could to assist the Debtor in connection with the criminal matter, the Debtor would be expected to repay such a large sum of money...." *Id.* at 975–76.

Our findings concerning Plaintiff's objection under Code § 727(a)(4)(A) are relevant to this issue as both require a showing of fraudulent intent. Presumably, the only statements that could constitute false claims under Code § 727(a)(4)(B) are the four allegations previously addressed, namely, the existence of Geygln's loans, the amount of the obligation, the valuation of Debtor's stock, and the stock's status as collateral for the loans.

Having found that Plaintiff failed to establish by clear and convincing evidence that any of these statements were made with fraudulent intent within the meaning of Code § 727(a)(4)(A), we note that Plaintiff presented no additional evidence to demonstrate the Debtor's fraudulent intent under Code § 727(a)(4)(B). Therefore, for the same reasons we denied Plaintiff's objection under Code § 727(a)(4)(A), we must similarly deny his objection under Code § 727(a)(4)(B).

### CONCLUSIONS OF LAW

1. The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding as provided by 28 U.S.C. § 157(b)(2)(J).

2. Plaintiff failed to prove by clear and convincing evidence that the Debtor made a false oath or account under Code § 727(a)(4)(A).

3. Plaintiff failed to prove by clear and convincing evidence that the Debtor presented or used a false claim under Code § 727(a)(4)(B).

4. Accordingly, the complaint objecting to the Debtor's discharge under Code § 727(a)(4)(A) and (B) is denied.

An Order shall enter in conformity herewith.