SELYA, Circuit Judge.
It was Sir Walter Scott who remarked the inevitability of the “tangled web we weave, when first we practice to deceive.” W. Scott, Marmion, canto VI, st. 17 (1808). This appeal sounds much that same theme. It centers around the quest of John E. Tully, debtor/appellant, for a discharge in bankruptcy. The bankruptcy court refused to grant the discharge on the ground that Tully knowingly failed to disclose material information when required. The district court upheld the denial. We affirm.
I. STATEMENT OF THE CASE
The appellant operated a rubbish disposal business as a sole proprietorship under the name and style of Nashoba Disposal Services (NDS). His father and brother each ran independent businesses in the same line of work. During 1983, the appellant began to feel a financial pinch. At about the same time, he, his father, and his brother entered into serious discussions with a national firm, Waste Management Partners (WMP), aimed at creating a mini-conglomerate which could profitably combine the business interests of the various members of the Tully family under one roof, so to speak.
The details of the ensuing negotiations are unimportant to this appeal. It suffices to catalog the results. The debtor, his father, and his brother organized Tully Disposal Corporation (Tully Disposal). The same trio, in combination with WMP, then formed a joint venture corporation. The debtor became an officer, director, and shareholder of Tully Disposal. In December 1983, a whirlwind series of interconnected transactions occurred. Among other things, the appellant transferred critical assets of NDS (e.g., its accounts, customer lists, goodwill) to Tully Disposal; these were simultaneously conveyed by Tully Disposal to the joint venture corporation. The latter agreed to perform certain bookkeeping and collection services for Tully Disposal in return for a share of the collections. Tully Disposal “paid” the debtor for NDS’s asset contribution by agreeing to assume all of NDS’s liabilities and giving the appellant two demand notes (Notes) aggregating $88,200. Similar deals were struck with respect to the businesses previously operated by the debtor’s father and brother, respectively. As seasoning for the dish, another (unrelated) firm, Dudley Rubbish Company, was contemporaneously acquired and sprinkled into the mix.
Such a multifaceted package required plenty of ribbon. A master agreement (Agreement) was executed among the various parties in interest. One provision of the Agreement obligated the joint venture corporation to pay to Tully Disposal, the debtor, his father, and his brother certain sums which it would “hold back” from collections of the preexisting accounts receivable. The holdback was to be remitted, with interest, one year after the transfer date.[1] The appellant signed the Agreement in three separate capacities: individually, as sole proprietor of NDS, and as president of Tully Disposal.
A gestation period elapsed. On or about October 4, 1984, some nine months after the Agreement was executed and the agglomeration of the businesses had been accomplished, the debtor filed a voluntary petition for straight bankruptcy under chapter 7 of the Code, 11 U.S.C. §§ 701 et seq. As required, his petition included sworn statements listing his assets (Schedules). Though alluding to the Tully Disposal stock, he omitted any reference to three significant items; his interests in the *108 joint venture, the Notes, and the holdback. Two weeks later, he amended the Schedules to reflect the first of these items — but again failed to mention the Notes or the holdback.
The initial meeting of creditors, see 11 U.S.C. § 341, took place on November 16, 1984. After some pointed questioning, information as to the Notes surfaced for the first time. The holdback was not discussed. In March 1985, the debtor moved to amend the Schedules once more, this time to bring the Notes into the picture. (The delay was never explained.) Although the proposed (second amended) Schedules were also submitted under oath, they still neglected to disclose the debtor’s interest in the holdback. Shortly thereafter, the trustee (appellee before us) filed a complaint against the debtor, objecting to any discharge and seeking other relief not now material.
In August 1985, the matter was tried in the bankruptcy court. After completion of the trial but prior to the rendition of any decision, the judge retired. The case was then assigned to a visiting judge,[2] who met with counsel on February 20, 1986. Although the record is less than explicit, the trustee represented at oral argument — and the appellant did not contradict — that Judge Goodman offered the parties a choice between two alternatives: retry the matter before him, in its entirety, or allow him to decide it on the original trial record. The protagonists agreed to the latter option. Thereafter, in a lengthy memorandum of decision, Judge Goodman found that the debtor’s monkeyshines anent the Notes and the holdback were tantamount to “a reckless indifference to truth equivalent to fraud,” thereby estranging Tully from the safe haven of a discharge. The district court agreed. This appeal followed.
II. STANDARD OF REVIEW
The threshold dispute between the parties concerns the appropriate standard of review. They agree that, in bankruptcy parlance, this is a “core” proceeding, such that the appeal arises under 28 U.S.C. §§ 157(b), 158. In the usual such instance, as the appellant concedes, findings of fact by the nisi prius court must be accepted unless they are clearly erroneous. In re Consolidated Bancshares, Inc., 785 F.2d 1249, 1252 (5th Cir.1986); In re Kimzey, 761 F.2d 421, 423 (7th Cir.1985); In re Morrissey, 717 F.2d 100, 104-05 (3d Cir.1983); In re Roco Corp., 64 B.R. 499, 500 (D.R.I.1986). And, “the standard adheres with undiminished force to inferences which the judge below has drawn from facts of record.” Id. See Commissioner v. Duberstein, 363 U.S. 278, 290-91, 80 S.Ct. 1190, 1199-1200, 4 L.Ed.2d 1218 (1960).
In an effort to evade the consequences of this approach, the appellant notes that the implementing procedural rule, effective August 1, 1983, promulgated under the Supreme Court’s statutory authority, 28 U.S.C. § 2075, states:
Findings of fact [by the bankruptcy court] shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.
Bankruptcy Rule 8013 (emphasis supplied). From the underscored language, the debtor deduces that since Judge Goodman, who did not preside at the trial, had no chance to see and hear the witnesses, an appellate court must view his findings through a less deferential glass.
We need not tarry long over this asseveration. In Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), the Court considered whether or not, under Fed.R.Civ.P. 52(a)[3]—which stands as a virtual twin to *109 Bankruptcy Rule 8013 — an appellate court may review de novo findings of fact not premised on credibility determinations. 470 U.S. at 573-76, 105 S.Ct. at 1511-13. The Court concluded that the clearly erroneous rule loses none of its vigor “even when the [lower] court’s findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.” Id. at 574, 105 S.Ct. at 1512. Justice White, writing for the majority, explained:
The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge’s position to make determinations of credibility. The trial judge’s major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge’s efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much. As the Court has stated in a different context, the trial on the merits should be “the ‘main event’ ... rather than a ‘tryout on the road.’ ” Wainwright v. Sykes, 433 U.S. 72, 90 [97 S.Ct. 2497, 2508, 53 L.Ed.2d 594] (1977). For these reasons, review of factual findings under the clearly-erroneous standard — with its deference to the trier of fact — is the rule, not the exception.
Id. at 574-75, 105 S.Ct. at 1512-13. We have applied Anderson unconditionally to factfinding emanating from a “paper” record. E.g., Valedon Martinez v. Hospital Presbiteriano de la Comunidad, Inc., 806 F.2d 1128, 1132 (1st Cir.1986) (Anderson rule governs district court’s resolution of conflicting facts anent diversity of citizenship, decided “on documentary evidence”). See also In re Morrissey, 717 F.2d at 104 (discussing meaning and effect of, and standard of review required by, Bankruptcy Rule 8013). Indeed, we anticipated Anderson in Custom Paper Products Co. v. Atlantic Paper Box Co., 469 F.2d 178 (1st Cir.1972), where we gave “clearly erroneous” deference to findings of fact stemming from evidence which was totally documentary and by affidavit, concluding that the “appellate function does not differ just because the parties expedited the trial by obviating the need of live witnesses.” Id. at 179.
Anderson and its progeny are dispositive of the point for the purposes at hand. As with Fed.R.Civ.P. 52(a), the fact that the text of Bankruptcy Rule 8013 “goes on to emphasize the special deference to be paid credibility determinations does not alter its clear command: [the rule] ‘does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a court of appeals to accept a [trial] court’s findings unless clearly erroneous.’ ” Anderson, 470 U.S. at 574, 105 S.Ct. at 1512 (quoting Pullman-Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982)). We hold that the clearly erroneous standard governs our review of this appeal in full flower, and that the bankruptcy judge’s findings are to be set aside only if, on the entire evidence, we are “left with the definite and firm conviction that a mistake has been committed.” United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). As we have recently said, “Where the conclusions of the [trier] depend on its election among conflicting facts or its choice of which competing inferences to draw from undisputed basic facts, appellate courts should defer to such fact-intensive findings, absent clear error.” Irons v. FBI, 811 F.2d 681, 684 (1st Cir.1987). It follows that if any reasonable view of the proof supports denial of the discharge (and absent any error of law), we are bound to uphold that action. Cf, e.g., United States v. Veillette, 778 F.2d 899, 902 (1st Cir.1985), cert. denied, - U.S. -, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986); United States v. Payton, 615 F.2d 922, 923 (1st Cir.), cert. denied, 446 *110 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 830 (1980).
III. THE MERITS
11 U.S.C. § 727(a) describes ten generic categories of circumstances which can forestall a debtor’s receipt of a discharge in bankruptcy. Section 727(a)(4)(A) controls this appeal. That statute provides in pertinent part:
(a) The court shall grant the debtor a discharge, unless—
******
(4) the debtor knowingly and fraudulently, in or in connection with the case—
(A) made a false oath or account; ....
Under § 727(a)(4)(A), the debtor can be refused his discharge only if he (i) knowingly and fraudulently made a false oath, (ii) relating to a material fact. The burden of proof rests with the trustee, In re Shebel, 54 B.R. 199, 202 (Bankr.D.Vt.1985), but “once it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged.” Matter of Mascolo, 505 F.2d 274, 276 (1st Cir.1974).
The statute, by its very nature, invokes competing considerations. On the one hand, bankruptcy is an essentially equitable remedy. As the Court has said, it is an “overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction.” Bank of Marin v. England, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966). In that vein, the statutory right to a discharge should ordinarily be construed liberally in favor of the debtor. Matter of Vickers, 577 F.2d 683, 687 (10th Cir.1978); In re Leichter, 197 F.2d 955, 959 (3d Cir.1952), cert. denied, 344 U.S. 914, 73 S.Ct. 336, 97 L.Ed. 705 (1953); Roberts v. W.P. Ford & Son, Inc., 169 F.2d 151, 152 (4th Cir.1948). “The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural.” Dilworth v. Boothe, 69 F.2d 621, 624 (5th Cir.1934).
On the other hand, the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, “[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt’s veracity and his willingness to make a full disclosure.” Mascolo, 505 F.2d at 278. Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight. See In re Tabibian, 289 F.2d 793, 797 (2d Cir.1961); In re Shebel, 54 B.R. at 202. The bankruptcy judge must be deft and evenhanded in calibrating these scales. And, we are fully satisfied that such a balance was struck in the case at bar.
In this instance, the trustee’s prima facie case was made out beyond the shadow of a doubt. John Tully had full knowledge of the intricacies of the joint venture deal. He was a principal in it, and helped to put it together. The arrangement was of recent origin. Yet, he neglected to list three significant assets in the original Schedules,[4] omitted two of those assets in the first amended set of Schedules, later— after he had been grilled at the § 341 creditors’ meeting — listed the Notes in a second amended set of Schedules, and never listed the holdback at any time in any Schedule. These omissions could certainly be styled, prima facie, as knowing and fraudulent— *111 and they were indubitably material. See In re Chalik, 748 F.2d 616, 618 (11th Cir.1984) (false oath material if subject matter “bears a relationship to the bankrupt’s business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property”). See also Mascolo, supra; Robinson, 506 F.2d at 1189; In re Steiker, 380 F.2d 765, 768 (3d Cir.1967). The bankruptcy judge explicitly (and supportably) found that:
the Debtor’s failure to amend his schedules promptly to include the notes and the Holdback evidence a reckless indifference to truth equivalent to fraud for purposes of section 727(a)(4)(A).
To be sure, the debtor tried to explain away his omissions. Without attempting to exhaust his litany of excuses, we note the appellant’s claim that he and his attorney were rushed at the time of filing because they wanted to beat the effective date of the 1984 amendments to 11 U.S.C. § 522(d)(5) (which threatened to limit allowable exemptions). We are aware, too, of his entreaty that he made a clean breast of the joint venture arrangement, in all its ramifications, to his counsel — who, by oversight it is said, failed properly to complete the Schedules. We know of the debtor’s contention that he brought the “closing binder” on the joint venture transactions to the § 341 meeting (along with myriad other documents) — and that the trustee, presumably, could have examined it. And, we have considered his assertion that the hold-back was not his asset, but was beneficially owned by Tully Disposal.
The short answer to these plaints is that the bankruptcy judge — the factfinder of first resort, see ante Part II — considered them and found them wanting.[5] The slightly longer answer is that these self-serving lamentations were, by and large, suspect. The original filing might have been accomplished in haste, but the later (amended) filings were done at the debtor’s leisure — and fell well short of the requisite disclosure. Such a pattern is strongly supportive of the bankruptcy court’s finding. See In re Nazarian, 18 B.R. 143, 147 (Bankr.D.Md.1982) (even if hurriedness could satisfactorily explain inaccuracies in original schedules, “no carelessness could excuse the Debtor’s failure to amend his schedules promptly when he had the leisure to do so”). The fact that the debtor came to the creditors’ committee session chock-a-block with records of then-undetermined significance does not suffice to save the day. A petitioner cannot omit items from his schedules, force the trustee and the creditors, at their peril, to guess that he has done so — and hold them to a mythical requirement that they search through a paperwork jungle in the hope of finding an overlooked needle in a documentary haystack. Nor can an attorney’s willingness to bear the burden of reproach provide blanket immunity to a debtor; it is well settled that reliance upon advice of counsel is, in this context, no defense where it should have been evident to the debtor that the assets ought to be listed in the schedules. See Mascolo, 505 F.2d at 277 n. 4; In re Russell, 52 F.2d 749, 754 (D.N.H.1931); Nazarian, 18 B.R. at 147. A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath.
The claim that the holdback was to benefit Tully Disposal rather than the appellant is unsupported by the record. The Agreement plainly stated that a substantial portion of these funds would be paid to NDS (the debtor’s sole proprietorship). The fact that, after the chapter 7 proceedings had begun, the check for the holdback was issued to Tully Disposal is of little moment; after all, the debtor was not only the alter ego of NDS, but a key member of the joint venture and the president of Tully Disposal. He had the ability to tailor matters to suit. In any event, given the applicable standard of materiality, see Chalik, 748 *112 F.2d at 618, the holdback — even on the debtor’s version of things — bore a sufficient relationship to the bankrupt’s business transactions and estate that disclosure was mandatory.
It would serve no useful purpose to deal with all of the factual minutiae of this case, item by item. It suffices to say that there was ample evidence in the record to support a reasoned conclusion by the bankruptcy judge that John Tully exhibited the “reckless indifference to the truth,” Diorio v. Kreisler-Borg Construction Co. (In re Diorio), 407 F.2d 1330, 1331 (2d Cir.1969) (per curiam), which has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A).[6] As we noted some eighty years ago, the statute necessitates no more than “an intentional untruth in a matter material to an issue which is itself material” to justify withholding a discharge. Troeder v. Lorsch, 150 F. 710, 713 (1st Cir.1906). That benchmark — regrettably—was met here.
Sworn statements filed in any court must be regarded as serious business. In bankruptcy administration, the system will collapse if debtors are not forthcoming. The record in this case shows, at the very least, cavalier indifference and a pattern of disdain for the truth. Meaningful disclosure was accorded much too low a priority. The law, fairly read, does not countenance a petitioner’s decision to play a recalcitrant game, one where the debtor hides, and the trustee is forced to go seek.
IV. CONCLUSION
We hold that the “clearly erroneous” rubric controls review of this case. Application of that standard requires us unreservedly to endorse the result below. Close perscrutation of the record fails to convey the impression that a mistake has been made. To the contrary, the denial of the discharge in bankruptcy because the appellant violated 11 U.S.C. § 727(a)(4)(A) seems to have been amply warranted.

Affirmed.

. Under Article 1.4 of the Agreement, payment of the holdback was to be made to "the Companies.” The Agreement defined that term to mean and include four entities, including Tully Disposal and NDS (the debtor’s sole proprietorship).

. The Honorable James A. Goodman, United States Bankruptcy Judge for the District of Maine, sitting by designation.

. Fed.R.Civ.P. 52(a) provides in pertinent part that: “Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.”

. Although John Tully disputes the worth of certain of the assets, e.g., his interest in the joint venture, valuation is not really the point. "Matters are material if pertinent to the discovery of assets, including the history of a bankrupt's financial transactions ... [so that] knowing and fraudulent omission of a bank account, whether or not it is closed at the time of filing, warrants the denial of the discharge.” Mascolo, 505 F.2d at 277-78 (citations omitted). See also In re Robinson, 506 F.2d 1184, 1188 (2d Cir.1974); Morris Plan Indus. Bank v. Finn, 149 F.2d 591, 592 (2d Cir.1945).

. The bankruptcy judge, for example, specifically found that, "in the circumstances of this case, the Debtor’s omission of assets from his schedules is excused neither by Debtor’s counsel's claim of fault nor by the amendment of schedules after the Trustee discovered the omission at the section 341 meeting.”

. Although we need not dwell on it, there was also circumstantial evidence in this record indicating a motive to dissemble: the combination of the joint venture initiative and the bankruptcy appears to have been calculated to leave the debtor doing business almost as usual, while his creditors — most prominently, those who had dealt with NDS — went away empty-handed.