In re Charles E. COLBURN, III, Debtor.

**PEOPLES BANK OF CHARLES TOWN, Plaintiff,**

v.

**Charles E. COLBURN, III, Defendant.**

**Bankruptcy No. 89–00677–AB.**
**Adv. No. 89–1109–AB.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Oct. 9, 1992.

John W. Thyden, Thyden & Gross, Washington, D.C., for debtor.

Lawrence H. Fischer, John B. Raftery, Deckelbaum, Ogens & Fischer, Washington, D.C., for Peoples Bank.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

Before this Court is a complaint filed by Peoples Bank of Charles Town ("Peoples Bank") seeking denial of the discharge of the debts of Charles E. Colburn, III (the "Debtor") pursuant to 11 U.S.C. § 727. For the reasons stated herein, this Court holds that the Debtor is not entitled to a general discharge of his debts.

The Debtor is a geologist who, during the 1980s, was an owner and officer of several corporations engaged in the oil and gas business. He received his undergraduate degree in geology from George Washington University in Washington, D.C. in 1977. The Debtor filed for protection from his creditors under Chapter 7 of the Bankruptcy Code on April 5, 1989. The Debtor's schedules of assets and liabilities ("Schedules") show claims and potential claims against the Debtor in excess of $446 million and property owned by the Debtor of approximately $810,000. By order of July 12, 1989, this Court authorized an examination of the Debtor under Bankruptcy Rule 2004. On August 23, 1989, Peoples Bank conducted a 2004 examination of the Debtor. On November 21, 1989, Peoples Bank filed its complaint objecting to the

discharge of the Debtor's obligations under 11 U.S.C. §§ 727(a)(4), 727(a)(2) and 727(a)(3). Peoples Bank contends in its complaint that the Debtor made numerous false oaths in his Schedules, in his statement of financial affairs ("Statement of Affairs"), and during his 2004 examination; concealed property within one year prior to the filing of his petition; and failed to maintain adequate records. On March 16, 1990, this Court entered an order compelling the Debtor to produce certain documents. On April 25, 1990, Peoples Bank filed an amendment to its complaint asserting that the Debtor should be denied a discharge under 11 U.S.C. § 727(a)(6) for his violation of such order. On July 16, 1990, a trial was conducted on Peoples Bank's complaint and at the conclusion of such trial we took this matter under advisement.

■ Section 727(a)(4)(A) requires that a debtor be barred from a general discharge if the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account. 11 U.S.C. § 727(a)(4)(A). In interpreting Section 727(a)(4)(A), we note that a creditor objecting to discharge must prove the following elements in order to succeed: (1) the debtor made a statement under oath; (2) such statement was false; (3) the debtor knew that such statement was false; (4) the debtor made such statement with fraudulent intent; and (5) such statement related materially to the bankruptcy case. *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir.1992); *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir.1992), *citing In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984); *Williamson v. Fireman's Fund Insurance Co.*, 828 F.2d 249, 251–252 (4th Cir.1987) ("[T]he debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud.... The false oath made by the debtor must have related to a material matter.").

The purpose of Section 727(a)(4)(A) "is to ensure that dependable information is supplied for those interested in the administration of the bankruptcy estate on which they can rely without the need for the trustee or other interested parties to dig out the true facts in examinations or investigations." *Guardian Indus. Prods. Inc. v. Diodati (In re Diodati)*, 9 B.R. 804, 807 (Bankr. D.Mass.1981) (citations omitted). The success of the bankruptcy process depends upon a debtor's willingness to provide the creditors with full and accurate disclosure. *See In re Mascolo*, 505 F.2d 274, 278 (1st Cir.1974). The Bankruptcy Code does not allow debtors to play "fast and loose with their assets or with the reality of their affairs." *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir.1987).

After carefully reviewing the Debtor's Schedules, Statement of Affairs, excerpts from both the transcript of his 2004 examination and testimony at trial, we find that the Debtor knowingly made the following false statements:

1. In response to Question 2(c) on his Statement of Affairs, which asks whether the Debtor had engaged in any business during the six years immediately preceding the filing of the original petition, the Debtor responded "No." However, the evidence before this Court demonstrates that the Debtor was engaged in oil and gas consulting or production and cattle breeding within six years prior to the filing of his petition.

With respect to the oil and gas business, the Debtor first testified under oath at his 2004 examination that he derived income from oil and gas consulting and that he had engaged in that type of work since 1980. *Trial Transcript (hereinafter "Tr.") at 61–62*. The Debtor testified that he made "approximately a couple thousand dollars" of income in 1987 and 1988 from oil and gas consulting. *Id.* In addition, the Debtor included with his 1987 and 1988 federal income tax returns a Schedule C ("Profit or Loss from Business or Profession") describing his business as "oil and gas production." *Exhs. 6 and 7.*

With respect to the cattle breeding business, the Debtor included with his 1987 and 1988 tax returns a separate Schedule C describing another of his businesses as "cattle breeding." *Exhs. 6 and 7.* When

first confronted at his 2004 examination as to why the cattle business was omitted from his Statement of Affairs, the Debtor stated that the business was owned jointly with his wife and that he understood Question 2(c) to require him to list businesses that he alone engaged in. *Tr. at 55.* At trial the Debtor testified that he did not participate in the cattle business at all and that the investment in the cattle was solely his wife's investment. *Tr. at 233–234.* However, nothing in the 1987 or 1988 tax returns suggests that the cattle business was the Debtor's wife's business or even that it was jointly owned. *Tr. at 57.* There are other Schedule C's that show his wife's businesses and jointly owned businesses. The cattle are on none of these. *Exhs. 6 and 7; Tr. at 59.* Furthermore, the Debtor submitted to Peoples Bank a financial statement on September 17, 1987, accompanied by a cover letter stating that "pursuant to your additional request that this financial statement not include the assets of my wife, ... I have responded to your request accordingly." *Exh. 9.* The September 17 financial statement shows 27 head of cattle valued at $134,300. *Exh. 10; Tr. at 58.*

2. In response to Question 2(d) on the Debtor's Statement of Affairs, which asks the Debtor what amount of income he had received from his trade or profession during each of the two calendar years immediately preceding the filing of the petition, the Debtor listed $62,000 for 1987 and $75,000 for 1988. *Exh. 3.* At the Debtor's 2004 examination, the Debtor was asked to disclose his sources of income for 1987 and 1988. The Debtor responded that "I'm not exactly sure. Probably Malibu [Capital Corporation]." *Tr. at 65.* The Debtor subsequently stated that "[t]wo main sources of income are Prince [Corporation] and Malibu Capital." *Id.* The Debtor then contradicted himself and stated "there's no salary right now hardly to myself. I haven't taken a salary from Malibu since its inception." *Tr. at 66–67.* A few moments later the Debtor stated again that he did take salary from Malibu. *Tr. at 68.* The Debtor contradicted himself once more and stated, when asked about compensation

from Malibu, "I didn't say I received any compensation. I don't know if I did receive any." *Tr. at 69.* His testimony was similarly evasive with respect to his sources of income during 1988. We note that as the president of both Malibu Capital Corporation and Prince Corporation, the Debtor signed all checks payable to himself. *Tr. at 48, 51, 66, 82.* We do not find it credible that the Debtor did not know the sources of his income in 1987 and 1988. Indeed, based on the circumstantial evidence presented at the trial, we find that the Debtor knew such sources but falsely testified at the 2004 examination with respect to such sources.

3. On Schedule B–2(q), which requires the Debtor to describe all contingent and unliquidated claims of every nature, the Debtor listed a $1 claim against Arc Energy Corporation and a $1 claim against FP Industries (the parent of Arc Energy). *Exh. 4.* However, the record reveals that the Debtor had a claim of approximately $500,000 against Arc Energy, a claim of approximately $500,000 against FP Industries, and claims against Malibu Capital Corporation and Prince Corporation for unpaid salary that he did not disclose on his Schedules.

■ The Debtor testified that he had a claim against Arc Energy for approximately $500,000, *Tr. at 295–296,* and a claim against FP Industries for $500,000, *Tr. at 107.* Both FP and Arc Energy were in bankruptcy at the time the Debtor filed his petition. *Exh. 40.* The Debtor explained that he did not list the actual claims against Arc Energy and FP Industries because of their bankruptcies and because he did not believe his claims were worth anything. *Tr. at 296.* However, a debtor is required to make full disclosure of his assets notwithstanding the fact that an asset may seem worthless. *In re Arcuri,* 116 B.R. 873, 881 (Bankr.S.D.N.Y.1990), *citing In re Chalik,* 748 F.2d at 618 ("[t]he recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting the admittedly omitted or falsely stated information concerned a worthless business relationship or holding.").

With respect to the claim against Malibu, balance sheets submitted by the Debtor to Peoples Bank on January 31, 1987 and September 17, 1987 show an account receivable from Malibu in the amount of $2.25 million. *Exhs. 8 and 10.* The notes accompanying such balance sheets state that the Debtor has an employment contract with Malibu that commenced January 31, 1987, requiring Malibu to pay the Debtor $150,000 per year for five years, with two five-year options periods. *Id.* The Debtor testified that he has never taken a salary from Malibu since its inception. *Tr. at 67.* Furthermore, the Debtor stated that "Malibu hasn't been able to pay, and I'm making a decision prior to the end of the month if I'm going to forgive that." *Tr. at 70.* With such testimony, the Debtor implicitly acknowledged that he had a claim for unpaid salary against Malibu that he failed to disclose on his Schedules.

With respect to the claim against Prince Corporation for unpaid salary, the record reveals that the Debtor is the president of Prince Corporation, earned $8,000 a month from Prince prior to the filing of his petition, and issued and signed his own paychecks. *Tr. at 66.* During his 2004 examination, the Debtor implicitly acknowledged that he had a claim for unpaid salary against Prince Corporation by testifying that he forgave such salary during the examination:

Q:  ... are you owed any salary by Prince Corporation?

A:  No.

Q:  You are not?

A:  I've forgiven all salary I have.

Q:  When did you forgive that salary?

A:  When the company didn't have the ability to pay, so I've forgiven it as of today. *Tr. at 70.*

4.  In response to Question 12(b) on the Statement of Affairs, which asks whether the Debtor has made any transfer, absolute or for the purpose of security, or any other disposition, of real or personal property during the year immediately preceding the filing of the petition, the Debtor answered "No." However, the Debtor's 1988 federal income tax return showed that the Debtor sold his stock in a company called Fingermatrix, Inc. on May 12, 1988, less than one year prior to the filing of his petition. The Debtor admitted at trial that such transfer occurred and that he did not list the transfer of the stock on his Statement of Affairs. *Tr. at 63–64.*

In addition, the Debtor transferred cattle that he owned to a creditor by virtue of a foreclosure in June 1988, less than one year prior to the Debtor filing his petition. The Debtor admitted at trial that such transfer occurred and that he did not list such transfer on his Statement of Affairs. *Tr. at 53–54.*

5.  In response to Question 4(a) on the Statement of Affairs, which asks what accounts or certificates of deposit or shares in banks, savings and loan, thrift, building and loan and homestead associations, credit unions, brokerage houses, pension funds and the like the Debtor has maintained, alone or together with any other person, and in the Debtor's own or any other name within the two years immediately preceding the filing of the petition, the Debtor failed to list an account that the Debtor testified was maintained by Prince Corporation as a fiduciary for the Debtor's benefit, as well as an account at Sovran Bank held jointly with his wife.

With respect to the Prince Corporation fiduciary account, the Debtor testified that Prince Corporation maintained only one bank account into which the corporation's funds as well as the Debtor's personal funds were deposited and intermingled. *Tr. at 83.* The Debtor stated that Prince Corporation paid his personal expenses as well as those of his wife, including their mortgage payments, out of money the Debtor and his wife deposited into the Prince account. *Tr. at 82–83.* The account was in the name of Prince Corporation. *Tr. at 82.* The Debtor contends that he created an accounting system that enabled the Debtor to distinguish between Prince Corporation funds and his personal funds. *Tr. at 83; Exh. 11.* He testified that he was the sole authorized signatory on the Prince account. *Tr. at 82.* He explained that the fiduciary account was created as a

matter of convenience because he traveled an extensive amount. *Id.*

The Debtor testified that he did not believe that the Prince Corporation account should be listed in response to Question 4(a) as such account was not in his name. Furthermore, he stated that he disclosed the Prince Corporation account by listing $200 on Schedule B–2 under "cash on hand." *Tr. at 182–183.* The language of Question 4(a) is broadly written and asks for the Debtor to list all accounts held within two years preceding the filing of the petition. The Debtor's listing of $200 under "cash on hand" did not put creditors on notice that the Prince Corporation fiduciary account existed. The Debtor's explanation that he was confused as to what accounts should and should not be listed is unpersuasive. In light of the fact that the Debtor acted as sole signatory on the Prince Corporation account and formulated an accounting system whereby he could distinguish between Prince Corporation funds and his personal funds, we do not find it credible that the Debtor was confused by the broad language of Question 4(a) and believed the proper way to disclose the unusual Prince fiduciary arrangement to his creditors was to list funds held by Prince as "cash on hand" without mentioning that his funds were held in a bank account in the name of Prince Corporation.

With respect to the Sovran account, the record reveals that the Debtor maintained a joint bank account with his wife at Sovran but failed to disclose it on his Statement of Affairs. At trial, the Debtor admitted that he did maintain a joint checking account at Sovran with his wife in the two years immediately preceding the filing of his petition. *Tr. at 237, 253.* However, at his 2004 examination, the Debtor swore that the only accounts that he possessed were those listed on his Statement of Affairs. He denied that he had a joint account with his wife. *Tr. at 78.* Later during a deposition he stated, "I never signed one of those checks [on the Sovran account]." *Tr. at 95–96.* However, the record reveals two checks were signed by the Debtor on the joint Sovran account within one year prior to the filing of his petition. *Exh. 16; Tr. at 97.* The Debtor's counsel, during the trial, stipulated to the fact that the Debtor signed such two checks. *Tr. at 97.* In addition, the Debtor admitted that he signed such two checks. *Tr. at 238.* The record also reveals that the Debtor deposited into the joint Sovran account at least one check, signed by the Debtor on behalf of Prince Corporation, drawn on the Prince Corporation account. *Tr. at 262; Exh. 17.*

6. On Schedule B–3(b), which requires a listing of property of any kind not otherwise scheduled, the Debtor did not list any interest in oil and gas wells. However, the record reveals that the Debtor, on the financial statements presented to Peoples Bank on January 31, 1987 and September 17, 1987, listed "Oil & Gas Producing & Non–Producing Properties" as having a value of $1,000,000. *Exhs. 8 and 10.* A note accompanying each financial statement describes approximately 40 properties showing a royalty interest, a working interest or a carried working interest, preceded by the following statement: "The following table represents the type and percentage of ownership for geological services in oil and gas properties". *Id.* On his Statement of Affairs, the Debtor reported $4,772.19 of income from oil and gas royalties in 1987 and $1,415.66 of income from oil and gas royalties in 1988. *Exh. 3; Tr. at 231.* The Debtor testified at trial that the oil and gas interests could be transferred to someone who could assume the Debtor's duties as a geologist and are worth "somewhere between $1.00 and $1,000,000." *Tr. at 110.* We find that the Debtor's oil and gas interests were assets of the estate and that the Debtor made a false oath by not disclosing such interests on Schedule B–3(b).

Furthermore, the Debtor failed to list on his Schedules the Debtor's reversionary interest in assets of a trust created by the Debtor in 1987 known as the "Prince Trust." The Prince Trust holds all of the stock of Prince Corporation which in turn owns approximately 50 percent of the stock of Malibu Capital Corporation. The record reveals that, if the trust were terminated, title to all trust assets would revert to the

Debtor. *Tr. at 121.* The Debtor testified that he valued the reversionary interest at "Zero." *Tr. at 224.* However, as we previously noted, a debtor may not omit the existence of an asset because he believes it to be worthless. *In re Chalik,* 748 F.2d at 618; *In re Arcuri,* 116 B.R. at 881.

7. In response to Question 3(c) on the Statement of Affairs, which asks the Debtor to list tax refunds that he is or might be entitled to, the Debtor answered "Unknown, but believed to be none." Also, on Schedule B-3 the Debtor did not list any tax refund as an asset of the estate. However, the record reveals that the Debtor's 1986 federal income tax returns dated April 28, 1989, 25 days after the Debtor filed his petition in bankruptcy, listed a refund in the amount of $10,320. *Tr. at 73; Exh. 5.* The Debtor never amended his Statement of Affairs or Schedules to reflect this refund. When initially asked under oath at his 2004 examination about whether the information on his Statement of Affairs regarding tax refunds was correct the Debtor responded "[t]hat's correct." *Tr. at 74.*

The Debtor's 1987 federal income tax return dated November 4, 1989, approximately seven months after the filing of the petition, listed $1,880 as a refund. *Exh. 6; Tr. at 75.* In addition, the Debtor's 1988 federal income tax return dated January 13, 1990, approximately nine months after the filing of the petition, listed a refund in the amount of $1,388. *Exh. 7; Tr. at 75.* The Debtor never amended his Statement of Affairs or Schedules to reflect these refunds.

The Debtor testified, with respect to all three tax refunds, that he did not disclose them because the Internal Revenue Service "garnished" the amount of the refunds against a claim that the IRS had against the Debtor for other taxes owed by the Debtor. *Tr. at 223–224.* The Debtor further testified that he was not sure who the tax refunds were owed to because in 1987 and 1988 his wife earned most of their income. *Tr. at 282.* We find that the 1986, 1987 and 1988 refunds were assets of the estate and the Debtor should have amended his Statement of Affairs and Schedules when he became aware he was entitled to them so as to enable his creditors to determine whether to challenge the IRS's action against such refunds. *See Mertz,* 955 F.2d at 598 (holding that a chapter 7 debtor is required to disclose a state tax refund as an asset, even if the refund is exempt property).

Each of the Debtor's false statements described herein was made either on the Schedules, on the Statement of Affairs, during his 2004 examination or during the trial. When a debtor signs a schedule and a statement of affairs, he does so under penalty of perjury, and such "written declarations have the force and effect of oaths." *Bold City VII, Ltd. v. Radcliffe (In re Radcliffe),* 141 B.R. 1015, 1021 (Bankr. E.D.Ark.1992), *citing March v. Sanders (In re Sanders,* 128 B.R. 963, 972 (Bankr. W.D.La.1991). In addition, when a debtor is subject to a 2004 examination he testifies under oath. A false oath sufficient to justify the denial of a discharge under Section 727(a)(4) includes (1) a false statement or omission in the debtor's schedules and statement of affairs or (2) a false statement by the debtor while the debtor is under examination during the course of the proceedings. *See Beaubouef,* 966 F.2d at 178, *quoting* 4 *Collier on Bankruptcy* p. 727.04[1], at 727–59 (15th ed. 1992). We therefore conclude that the Debtor, in the case at bar, made such false statements under oath.

Under Section 727(a)(4), the false statement must have been knowingly and fraudulently made. 11 U.S.C. § 727(a)(4). Determining whether a debtor acted with fraudulent intent is difficult because it is unlikely that a debtor will admit to such intent. Therefore, fraudulent intent may be inferred from the Debtor's course of conduct or other circumstantial evidence. *Williamson,* 828 F.2d at 252, *citing In re Devers,* 759 F.2d 751, 754 (9th Cir.1985) ("Because a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent from all the facts and circumstances of a case."); *see Farmers Co-op. Ass'n v. Strunk,* 671

F.2d 391, 395 (10th Cir.1982) ("Fraudulent intent ... may be established by circumstantial evidence, or by inferences drawn from a course of conduct."). Where a debtor has engaged in a pattern of omissions or committed ˑ ˑmerous inaccuracies a presumption may be made that the debtor acted with fraudulent intent or acted with such reckless disregard for the truth as to be the equivalent of fraud. *In re Tully,* 818 F.2d 106, 112 (1st Cir.1987), *citing Diorio v. Kreisler–Borg Constr. Co. (In re Diorio),* 407 F.2d 1330, 1331 (2d Cir.1969) (per curiam) ("reckless indifference to the truth ... is the equivalent of fraud").

█ In the case at bar, the Debtor made no fewer than seven false statements under oath relating to prior businesses, two bank accounts, transfers of stock and cattle, oil and gas interests, tax refunds, claims for unpaid salary, a reversionary interest, and sources of income during 1987 and 1988. The number and frequency of such false statements constitute persuasive evidence that the Debtor was acting with fraudulent intent or with such reckless disregard for the truth as to be the equivalent of fraud when he made such statements. The Debtor failed to credibly rebut the evidence that he acted with fraudulent intent. Although the Debtor claimed that he did not understand some of the questions in the Statement of Affairs and the Schedules, because of the number of false statements made by the Debtor, and in light of the fact that the Debtor was represented by competent counsel when preparing answers to such questions and that the Debtor is a college educated and experienced businessman, we do not find it credible that such false statements were made as a result of honest confusion or a lack of understanding.

█ Turning to the materiality element under Section 727(a)(4), we note that a false oath must relate to a material matter. *See Williamson,* 828 F.2d at 251. A false oath is material "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Id.* at

252, *quoting In re Chalik,* 748 F.2d at 618. With respect to the Debtor's false oaths relating to his two bank accounts, his royalty interest, his claims for unpaid salary, and his 1986, 1987 and 1988 tax refunds, we conclude that such false oaths were material in that they hindered creditors from discovering such assets. With respect to the Debtor's false oaths relating to his failure to disclose the oil and gas consulting or production business and the cattle breeding business, and his sources of income during 1987 and 1988, we conclude that such false oaths were material in that they hindered creditors from ascertaining the Debtor's business dealings. With respect to the Debtor's false oaths relating to his failure to disclose the transfer of his cattle and the Fingermatrix stock, we conclude that such false oaths were material in that they involved the disposition of the Debtor's property. With respect to the Debtor's false oaths relating to his understating the amount of his claim against Arc Energy and FP Industries, and his failure to disclose claims against Malibu Capital and Prince Corporation, we conclude that such false oaths were material in that they bore a relationship to the Debtor's business transactions or estate.

█ The party objecting to a general discharge has the burden of proving such objection. Bankruptcy Rule 4005. However, "once it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged." *In re Tully,* 818 F.2d at 110, *quoting In re Mascolo,* 505 F.2d 274, 276 (1st Cir.1974). The Supreme Court recently stated that "it is fair to infer that Congress intended the ordinary preponderance standard to govern the applicability of all the discharge exceptions." *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 659–660, 112 L.Ed.2d 755 (1991). *See also Union Bank v. Farouki (In re Farouki),* 133 B.R. 769, 776 (Bankr.E.D.Va.1991), wherein this Court applied the preponderance of the evidence standard to Section 727 actions requiring a showing of fraud. This Court concludes, after hearing the testimony and

considering all of the other evidence, that Peoples Bank proved, by a preponderance of the evidence, that the Debtor knowingly and fraudulently, in or in connection with his case, made the false oaths described herein, and that the Debtor failed to come forward with credible evidence that he did not commit the offense charged. Accordingly, the Debtor will be denied a discharge pursuant to 11 U.S.C. § 727(a)(4)(A).

Where a debtor omits property from his schedules or statement of affairs such omission can constitute not only a false oath under 727(a)(4) but also a concealment under 11 U.S.C. § 727(a)(2). *See Strunk*, 671 F.2d at 395; *In re Sanders*, 128 B.R. at 972. Section 727(a)(2) provides, in part, that a debtor is not entitled to a discharge if the debtor "with intent to hinder, delay, or defraud a creditor ... has ... concealed" property of the estate or the debtor's property within one year prior to the date of the filing of the petition. 11 U.S.C. § 727(a)(2). Because the language of Section 727(a)(2) relating to intent is in the disjunctive, an intent to hinder or delay creditors suffices. *Comprehensive Accounting Corp. v. Morgan (In re Cycle Accounting Serv.)*, 43 B.R. 264, 271 (Bankr.E.D.Tenn.1984). Intent to hinder or delay may be inferred from an omission of valuable assets from a debtor's statement of affairs or schedules. *Id.* citing 4 Collier on Bankruptcy ¶ 727.02[3], 727–13 (15th ed. 1984). After carefully reviewing the Schedules, Statement of Affairs, excerpts from the transcript of his 2004 examination and testimony at trial, we conclude that the Debtor concealed the following property within one year prior to the date of the filing of the petition with intent to hinder or delay creditors:

1. In our analysis of Peoples Bank's claims under Section 727(a)(4) we found that the Debtor had a reversionary interest in assets of the "Prince Trust" which he failed to list on Schedule B–3(b). There is no question that the Debtor was intimately familiar with the Prince Trust at the time he filed his petition. In 1987, he retained a Washington, D.C. attorney, Stephen Gray, to set up the Prince Trust as an offshore trust under the laws of Bermuda. *Tr. at 128.* According to Gray, one of the purposes of the Trust was "to divest the settlor of sufficient ownership of the trust principal and later the accumulating income so as to defeat any future creditors of the settlor without transferring away the settlor's ability to benefit from the fruits of those assets and to possibly reacquire the trust principal at some future date." *Tr. at 132.* The Debtor was the settlor of the Prince Trust. *Tr. at 162.* A trustee of the Prince Trust was Bermuda Trust Company, Ltd., a subsidiary of the Bank of Bermuda. *Tr. at 155; 158.* The Debtor held the position of "First Chair" of the Prince Trust Committee of Trust Protectors which is an advisory board that has the ability to transmit advice to the trustee. *Tr. at 137.* In addition, the record reveals that on January 13, 1988, Malibu Capital Corporation filed with the Securities and Exchange Commission a "Form 8." *Exh. 41.* Form 8 stated that "[A]ll of the outstanding shares of Prince Corporation common stock is owned by Prince Trust, a Bermuda trust created by [the Debtor] as grantor.... [The Debtor] ... has an advisory role over trust assets and has a reversionary interest in trust assets upon its termination...." Form 8 was signed on behalf of Malibu by the Debtor in his capacity as president of Malibu. *Exh. 41.* Based on such evidence, we conclude that the Debtor knew of his reversionary interest at the time he prepared his Schedules and Statement of Affairs but chose to conceal such interest. Actual intent to hinder or delay creditors may be proved by circumstantial evidence. *Strunk*, 671 F.2d at 395. In light of the pattern of his omissions and the inconsistencies in his testimony, we conclude that the Debtor concealed his residual interest with intent to at least hinder or delay his creditors.

Peoples Bank also contends that the assets of the Prince Trust belonged to the Debtor at the time of the filing of his petition and because the Debtor failed to disclose such assets the Debtor should be denied a discharge pursuant to Section 727(a)(2). However, Peoples Bank has failed to prove that such assets were prop-

erty of the Debtor or his estate. Peoples Bank did not introduce any evidence that the creation of the Prince Trust or the Debtor's transfer of assets to the Prince Trust was in any way defective or that, under any other theory, the Debtor has any interests in the assets of the Prince Trust other than his reversionary interest.

2. The Debtor testified that there was approximately $1,079 of his personal funds in the Prince fiduciary account when he filed his petition, and the $200 that he listed as "cash on hand" was an estimate he made when he filled out the Schedules. *Tr. at 182–183.* By not disclosing, in response to Question 4(a) on the Statement of Affairs, the Prince Corporation fiduciary account and the $1,079 held by Prince, the Debtor concealed such account and funds in violation of Section 727(a)(2) within one year prior to the filing of his petition. The Debtor testified that he was confused as to whether he should list the Prince Corporation fiduciary account when he filled out his Statement of Affairs because such account was not in his name. In light of the Debtor's advanced education and the straightforward nature of Question 4(a), we find his explanation unpersuasive. We can only conclude that the Debtor's failure to disclose the Prince fiduciary account and his personal funds held by Prince resulted from his intent to hinder or delay his creditors.

3. In our Section 727(a)(4) analysis, we found that the Debtor failed to list, in response to Question 4(a) on the Statement of Affairs, a joint checking account the Debtor maintained with his wife at Sovran Bank. We also found that two checks were signed by the Debtor on the joint Sovran account within one year prior to the filing of his petition. *Tr. at 97; Exh. 16.* The record reveals that the last statement that Sovran Bank produced for the account was dated January 11, 1989, less than three months prior to the filing of the petition. *Tr. at 100; Exh. 36.* Based on this evidence, we conclude that the Debtor knew of the joint Sovran account at the time he prepared his Schedules and Statement of Affairs but chose to conceal it with the intent to hinder or delay his creditors.

4. We also found earlier in this opinion that the Debtor failed to list on Schedule B–3(b) the Debtor's royalty interests, working interests or carried working interests in oil and gas wells. The record reveals that the Debtor continued to own such oil and gas interests at the time he filed his petition. *Tr. at 110.* On his Statement of Affairs, the Debtor reported $4,772.19 of income from oil and gas royalties in 1987 and $1,415.66 of income from oil and gas royalties in 1988. *Exh. 3; Tr. at 231.* Such evidence causes this Court to conclude that the Debtor chose to conceal his oil and gas interests at the time he prepared his Schedules and Statement of Affairs with the intent to hinder or delay his creditors.

■■■■ Peoples Bank also contends that the Debtor should not be granted a discharge under Section 727(a)(3), which provides that a debtor is barred from a general discharge if the debtor has failed to keep or preserve records from which his financial condition or business transactions might be ascertained. 11 U.S.C. § 727(a)(3). It is not necessary for a debtor to keep books and records in the same order as that of a sophisticated businessman, but a debtor's records must provide creditors with insight into a debtor's financial condition and business dealings. *See Nisselson v. Wolfson (In re Wolfson ),* 139 B.R. 279, 286 (Bankr.S.D.N.Y.1992). The court in *In re Underhill,* 82 F.2d 258, 260 (2d Cir.1936), *cert. denied,* 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402 (1936), stated that the standard as to whether the debtor has kept or preserved adequate records is whether the debtor's "present financial condition ... and his business transactions for a reasonable period in the past may be ascertained." In fact, a debtor's duty to keep detailed records of financial dealings does not surpass that of an ordinary taxpayer. *In re Caparelli,* 131 B.R. 895, 899 (Bankr. S.D.Fla.1991). Peoples Bank has the burden of proof on this issue and, if it satisfies its burden, the Debtor carries the burden of proof as to whether his failure to maintain books and records was justified. *See In re Wolfson,* 139 B.R. at 285. Even

construing Section 727(a)(3) liberally in favor of the Debtor, we must nevertheless conclude that Peoples Bank has proved by a preponderance of the evidence that the Debtor failed to maintain adequate books and records with respect to the Prince Trust as well as the sources of his income in 1987 and 1988, and that the Debtor has failed to show that such failure was justified.

The Debtor testified that he did not retain a copy of the agreement creating the Prince Trust and that he cannot require the trustee to provide him with a copy of the agreement. *Tr. at 49–50.* The Prince Trust was set up, according to the Debtor, for the purpose of protecting "millions of dollars" worth of assets belonging to the Debtor by putting them in trust for the benefit of his family. *Tr. at 49, 225, 226.* The Debtor's attorney, Stephen Gray, testified that after the trust agreement was drafted, Gray was instructed by the Debtor to do two things: (1) send the trust agreement to the Bank of Bermuda for execution and (2) not retain any copies of the trust agreement. *Tr. at 160.* No creditor should be placed in a situation where there are no "accurate signposts on the trail showing what property passed through the debtor's hands during the period prior to his bankruptcy." *Morton v. Dreyer (In re Dreyer),* 127 B.R. 587, 594 (Bankr.N.D.Tex. 1991). The creditors of the Debtor had the right to examine the trust agreement to understand under what terms and conditions the Debtor's assets were placed into the trust and how they might be returned to the Debtor. We conclude that by not retaining a copy of the trust agreement, the Debtor failed to maintain adequate books and records from which his financial condition or business transactions relating to the trust might be ascertained.

With respect to books and records relating to the Debtor's sources of income in 1987 and 1988, we found in our analysis under Section 727(a)(4) that the Debtor listed income in the amount of $62,000 for 1987 and $75,000 for 1988 on his Statement of Affairs. However, the Debtor failed to explain the sources of such income. *Tr. at 65–69.* The Debtor testified that he did not have any IRS Form W–2 or other written evidence of the source of his income. *Tr. at 68.* Although the Debtor was the president of both Malibu Capital Corporation and Prince Corporation and signed all paychecks payable to himself, he could not produce adequate records with respect to his income. *Tr. at 48, 51, 66, 82.* Courts have considered several factors in determining whether a debtor should be denied a discharge under Section 727(a)(3). These factors include the debtor's level of education, business experience and sophistication, the complexity of the debtor's business, the amount of credit extended to the debtor during his business activity, and other extenuating circumstances. *Farouki,* 133 B.R. at 781. In light of the fact that the Debtor is a college graduate who is experienced in business and financial matters and who signed his own paychecks, we find that the Debtor's failure to maintain books and records that would explain the sources of his income for 1987 and 1988 was not justified under the circumstances. The Debtor put his creditors in a position of having to guess what were his sources of income earned in 1987 and 1988. His creditors were entitled to records that would give them adequate information relating to such sources.

For the foregoing reasons, we hold that the Debtor is hereby denied a general discharge of his debts under 11 U.S.C. §§ 727(a)(4), 727(a)(2) and 727(a)(3). Because we deny the Debtor a discharge pursuant to such sections, it is not necessary for this Court to address whether the Debtor should be denied a discharge pursuant to 11 U.S.C. § 727(a)(6). An appropriate order will be entered.[1]

1. As a result of a clerical error, the Clerk of   Court inadvertently issued a notice of the grant-

ing of a discharge to the Debtor on July 26, 1989. In accordance with the conclusions of

this Court, we vacate such notice.